874 So.2d 746 (2004)
In re Judge Yvonne L. HUGHES.
No. 2003-O-3408.
Supreme Court of Louisiana.
April 22, 2004.
Rehearing Denied June 25, 2004.
*752 Steven R. Scheckman, Special Counsel, Mary F. Whitney, Asst. Special Counsel, Tatiana J. Lopez, Asst. Special Counsel, Office of Special Counsel.
Nancy E. Rix, Commission Legal Counsel, Hugh M. Collins, Chief Executive Officer, Danna M. Acker, Metairie, Judiciary Commission of Louisiana.
St. Paul Bourgeois, IV, Lafayette, Yvonne L. Hughes, New Orleans, Counsel for Respondent.
WEIMER, J.
This judicial disciplinary proceeding comes before the court on the recommendation of the Judiciary Commission of Louisiana (the "Commission")[1] that Judge Yvonne L. Hughes of the Orleans Parish Juvenile Court, Division "C," State of Louisiana, be removed from judicial office and ordered to reimburse the Commission the costs incurred in the investigation and prosecution of the case. The Commission conducted an investigatory hearing, made findings of fact and conclusions of law, and recommended that respondent be removed from office for violating Canons 1, 2 A, 2 B, 3 A(1), 3 A(3), 3 A(4), 3 A(7), 3 B(1) and 7 B(1)(a) of the Code of Judicial Conduct and La. Const. art. V, § 25(C). The Commission also recommended that this court reserve the right of the Attorney Disciplinary Board of the Louisiana State Bar Association to bring lawyer discipline proceedings against respondent. See La. Const. art. V, § 25(D).
After a thorough review of the evidence, we find that the charges against Judge Hughes are supported by clear and convincing evidence, the requisite standard of proof for ethical misconduct in judicial discipline cases. We additionally find that the most severe discipline is warranted in this case because Judge Hughes repeatedly engaged in willful misconduct relating to her official duties and persistent and public conduct prejudicial to the administration of justice that has brought her judicial office into disrepute. Accordingly, we order that Judge Hughes be removed from office and that her office be declared vacant. Judge Hughes is additionally assessed costs in the amount of $20,293.12. Finally, in order that consideration may be given to how Judge Hughes' conduct bears on her fitness to practice law, we expressly reserve the right of the Attorney Disciplinary Board of the Louisiana State Bar Association to institute lawyer discipline proceedings against Judge Hughes.

FACTS AND PROCEDURAL HISTORY
Judge Hughes commenced her term as judge for Division C of the Orleans Parish Juvenile Court on January 1, 2001. Shortly before her assumption of office, in August 2000, the Commission, on its own *753 motion, opened a file based upon a newspaper article in Gambit Weekly reporting that judicial candidate Yvonne Hughes had been fined repeatedly by the Louisiana Ethics Board for campaign finance reporting violations.[2]
Thereafter, in January 2001, shortly after Judge Hughes assumed her official duties, the Louisiana Attorney Disciplinary Board (the "Board") transferred to the Commission formal charges that had been filed against Judge Hughes in her capacity as an attorney, but that had not yet proceeded to hearing. The Board also transferred additional files representing open investigations of Judge Hughes' conduct in her capacity as an attorney. While the files involved alleged misconduct that occurred primarily (but not entirely) before Judge Hughes assumed office and concerned acts committed in her capacity as an attorney, the Commission acquired jurisdiction of these matters by virtue of La. Sup.Ct. Rules XIX and XXIII.
After conducting its own investigation into the aforementioned matters, the Commission, on March 20, 2002, filed fifteen counts of formal charges against Judge Hughes. These charges, which are hereinafter referred to as the "Lawyer Charges," allege the following violations:
Charge 0162: In the fifteen elections in which Judge Hughes participated as a candidate for elective office since 1988, respondent repeatedly failed to file the required campaign finance disclosure reports within the statutory deadlines, resulting in fines and fees totaling $48,300.00 by November 2000, and the institution of garnishment proceedings to enforce and collect unpaid penalties, which outstanding amounts were ultimately resolved in a compromise between Judge Hughes and the Board of Ethics reducing the outstanding unpaid fine to $14,000.00 to be paid pursuant to garnishment proceedings. These actions violated the Campaign Finance Disclosure Act, LSA R.S. 18:1481, et seq., and in particular, R.S. 18:1495.4, 18:1505.1 and 18:1505.4, as well as Canons 1, 2 A, and 7 B(a) of the Code of Judicial Conduct (1976), Canons 1, 2 A, and 7 B(1)(a) of the Code of Judicial Conduct (1996) and La. Const. art. V, § 25(C) in that the actions were willful misconduct relating to the judge's official duty and were persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute.

Charge 0163: Attorney Yvonne Hughes was retained by Linda Porter to represent her son in a criminal matter. Despite being paid $300.00 toward a total retainer of $1,000.00, respondent failed to show up for any scheduled court appearances, filed no pleadings in the case, and failed to cooperate in the investigation of the complaint. These actions violated Rules 1.3, 8.1(c) and 8.4(g) of the Rules of Professional Conduct, Canons 1 and 2 A of the Code of Judicial Conduct (1996), and La. Const. art. V, § 25(C) in that the actions were persistent and public conduct prejudicial to the administration *754 of justice that brought the judicial office into disrepute.
Charge 0164: Attorney Yvonne Hughes was retained and paid $1,000.00 to represent Phillip Green in a criminal matter. After filing form pleadings set for hearing on May 9, 1996, respondent failed to appear at said hearing or at any other hearings. When respondent was discharged by Mr. Green, she refused to refund the unearned portion of her fee and failed to cooperate in the investigation of Mr. Green's complaint. These actions violated Rules 1.3, 1.16(d), 8.1(c), and 8.4(g) of the Rules of Professional Conduct, Canons 1 and 2 A of the Code of Judicial Conduct (1976) and La. Const. art. V, § 25(C) in that the actions were persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute.
Charge 0165: After having her notarial commission suspended, Attorney Yvonne Hughes continued to hold herself out as a notary and to perform notarial services. Respondent's notarial commission has never been reinstated. These actions violated Rule 8.4(c) of the Rules of Professional Conduct, Canons 1 and 2 A of the Code of Judicial Conduct (1976) and La. Const. art. V, § 25(C) in that the actions were persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute.
Charge 0166: Attorney Yvonne Hughes was retained and paid $600.00 to represent Dexter Quinn, Sr. in two criminal matters. Respondent failed to communicate with Mr. Quinn, filed no pleadings in either matter, and failed to appear at any scheduled court hearings. Mr. Quinn was forced to represent himself. Respondent failed to return the unearned portion of the fee. These actions violated Rules 1.3, 1.4(a) and 1.5(f)(6) of the Rules of Professional Conduct, Canons 1 and 2 A of the Code of Judicial Conduct (1996) and La. Const. art. V, § 25(C) in that the actions were persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute.
Charge 0167: Cletis Jessie paid $100.00 each to two of Attorney Hughes' employees in the mistaken belief that they were attorneys in respondent's office who would represent him in court. No one appeared in court on his behalf. The employees were using respondent's office, business cards, and receipt book. After initially denying that the individuals were her employees, respondent admitted that they were in fact her employees. These actions violated Rules 5.3(b) and 8.4(c) of the Rules of Professional Conduct, Canons 1 and 2 A of the Code of Judicial Conduct (1996) and La. Const. art. V, § 25(C) in that the actions were persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute.

Charge 0168: Attorney Yvonne Hughes was retained by Donald Jones to represent him in a criminal matter and paid $2,100.00 to do so. Respondent failed to communicate with her client, failed to appear for court hearings, filed no pleadings in the case, and refused to refund the unearned portion of her fee. These actions violated Rule 1.3, 1.4(a), and 1.5(f)(6) of the Rules of Professional Conduct, Canons 1 and 2 A of the Code of Judicial Conduct (1996) and La. Const. art. V, § 25(C) in that the actions were persistent and public conduct prejudicial *755 to the administration of justice that brought the judicial office into disrepute.
Charge 0169: Troy L. Dews paid Attorney Yvonne Hughes $2,500.00 to represent his nephew in a criminal matter. Respondent did no work in the case, forcing Mr. Dews to retain and pay new counsel. When Mr. Dews demanded a refund of the legal fee, respondent sent a partial refund by check drawn on her client trust account. The check was returned twice for insufficient funds. After nine months, the refund remained unpaid. While respondent claimed to have earned a portion of the fee and to have incurred expenses by making a trip to Jackson, Mississippi, on her client's behalf, she failed to produce any documents evidencing the trip and failed to cooperate with the investigation of the complaint. These actions violated Rules 1.4(a), 1.5(f)(6), 1.16(d), 8.4(c), 8.1(c), and 8.4(g) of the Rules of Professional Conduct, Canons 1 and 2 A of the Code of Judicial Conduct (1996) and La. Const. art. V, § 25(C) in that the actions were persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute.
Charge 0170: Attorney Yvonne Hughes was retained by Irma Rudolph to represent her son in a criminal matter. Despite receiving $800.00, respondent filed no pleadings in the case. After securing a bond for Mr. Rudolph, respondent attended court on his behalf on three occasions. Thereafter, respondent failed to appear at a scheduled hearing, which was continued to the next day due to her absence. When she failed to appear the next day, the court was forced to appoint counsel to represent Mr. Rudolph. Respondent refused to refund the unearned portion of her fee. These actions violated Rules 1.1(a), 1.3, and 1.4 of the Rules of Professional Conduct, Canons 1 and 2 A of the Code of Judicial Conduct (1996) and La. Const. art. V, § 25(C) in that the actions were persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute.
Charge 0171: In December 1995, Patricia Chambers retained Attorney Yvonne Hughes to file a civil suit against the Orleans Parish Criminal Sheriff to recover damages for injuries Ms. Chambers allegedly received while incarcerated. On April 1, 1996, respondent filed a petition for damages, but failed to file any additional pleadings in the matter until March 1998, when she filed a motion to withdraw as counsel. In a telephone conversation with Ms. Chambers in November 1999, respondent advised Ms. Chambers that one of her relatives had terminated respondent's representation, and that she should come into respondent's office and sign a contingency contract should she wish respondent to determine the status of her case, which she did. The case was subsequently dismissed on grounds of abandonment. These actions violated Rules 1.3, 1.4, and 1.16(d) of the Rules of Professional Conduct, Canons 1, 2 A and 2 B of the Code of Judicial Conduct (1996) and La. Const. art. V, § 25(C) in that the actions were persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute.

Charge 0172: Attorney Yvonne Hughes was retained and paid $700.00 by Walter Houston to represent him in a *756 parole revocation matter. Respondent failed to render any legal services on his behalf, failed to communicate with him, and failed to refund the unearned portion of the fee. These actions violated Rules 1.1(a), 1.3, 1.4, 1.5(f)(6), and 1.16(d) of the Rules of Professional Conduct, Canons 1 and 2 A of the Code of Judicial Conduct (1996) and La. Const. art. V, § 25(C) in that the actions were persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute.
Charge 0173: Attorney R. Joshua Koch, Jr. was retained to represent plaintiff Hilda Monroe in civil litigation. Attorney Yvonne Hughes had previously represented Ms. Monroe and was counsel of record in the case. Despite repeated requests, respondent failed to surrender a copy of Ms. Monroe's file to her new counsel. These actions violated Rules 1.16(d), 8.1(c), and 8.4(g) of the Rules of Professional Conduct, Canons 1 and 2 A of the Code of Judicial Conduct (1996) and La. Const. art. V, § 25(C) in that the actions were persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute.
Charge 0174: On December 13, 2000, Attorney Yvonne Hughes was retained by Matthew Perez to represent his stepson in a criminal matter. Respondent, who would assume her judicial office in 21 days, agreed to the representation for a fee of $1,500.00. On December 21, 2000, respondent received $700.00 toward this fee. She appeared in court on behalf of Mr. Perez's stepson on that same date. A motion hearing was set for January 18, 2001, and trial was set for January 22, 2001. Respondent abandoned her representation when she assumed judicial office on January 1, 2001, and failed to refund the unearned portion of her fee. These actions violated Rules 1.3, 1.4(a), 1.5(f)(6), 1.16(d), 8.4(c), and 8.4(d) of the Rules of Professional Conduct, Canons 1 and 2 A of the Code of Judicial Conduct (1996) and La. Const. art. V, § 25(C) in that the actions were persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute.

Charge 0175: On December 21, 2000, approximately 13 day prior to assuming judicial office, Attorney Yvonne Hughes was retained by Lana Turner to represent her son, Darnell Turner, in connection with a charge of second degree murder. Failing to advise Ms. Turner that she had been elected to judicial office, respondent agreed to represent Mr. Turner for a fee of $1,500.00, which she traveled to Ms. Turner's home to pick up. Ms. Turner was not able to reach respondent again until December 28, 2000, when respondent advised her that she was traveling back to New Orleans from Connecticut and would call her upon her return. Respondent did not call Ms. Turner, but she did secure the services of a private investigator to whom she remitted $500.00 from the funds Ms. Turner had paid her. Upon assuming office on January 1, 2001, respondent abandoned her representation of Mr. Turner, failed to advise Mr. Turner of this fact, failed to advise Mr. or Ms. Turner that she had secured other counsel to represent him, failed to secure permission for the substitute representation, and failed to return the unearned portion of her fee. These actions violated Rules 1.3, 1.4(a), 1.5(f)(6), 1.16(d), 8.4(c), and 8.4(d) of the Rules of Professional *757 Conduct, Canons 1 and 2 A of the Code of Judicial Conduct (1996) and La. Const. art. V, § 25(C) in that the actions were persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute.
Charge 0176: Dwight Carter paid Attorney Yvonne Hughes, through various employees of her law office, $442.00 to represent him in certain legal matters. Respondent failed to render the requested services, failed to communicate with her client, and failed to refund the unearned portion of her fee. In addition, to the extent that respondent's employees were accepting fees on her behalf and advising Mr. Carter that legal services would be rendered, respondent failed to adequately supervise non-lawyer employees of her office. These actions violated Rules 1.3, 1.4(a), 1.5(f)(6), 1.16(d), 5.3(b), and 8.4(c) of the Rules of Professional Conduct, Canons 1 and 2 A of the Code of Judicial Conduct (1996) and La. Const. art. V, § 25(C) in that the actions were persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute.
Judge Hughes filed answers to these charges on May 21, 2002.
On May 31, 2002, while the Lawyer Charges were pending, the Commission received an anonymous complaint against Judge Hughes, alleging that, among other things, she hired a career criminal with no clerical skills as her administrative assistant; hired her boyfriend as the compliance officer for drug court; hired only "incompetent" friends to work in her section of court, causing her to fall behind in rendering judgments; could not keep a court reporter; worked only "2 or 3 days a week and comes in very late when she does work," sometimes continuing whole dockets because she decided not to come in; and allowed a person named Melvin Smith to "hang around her section at all hours," giving him access to confidential juvenile proceedings and the court's computer system despite the fact that when she tried to hire him as a court employee, "his drug test came back positive for cocaine."
Upon receiving no response from Judge Hughes to a letter of inquiry asking her to respond to the issues raised by the anonymous complaint, the Commission authorized an investigation. As a result of that investigation, on January 23, 2003, the Commission filed three additional counts of formal charges against Judge Hughes. These charges, which are hereinafter referred to as the "Judge Charges," allege the following:
Charge 0191: Judge Hughes allowed Wayne Barley, a convicted felon, to operate out of her section of court and act as a conduit for telephone calls from individuals seeking the release of adult detainees from jail. After determining that an individual was in fact being detained, Barley delivered the information to Judge Hughes who then called the Sheriff's Office to order the individual's release. From January 2001, through December 2002, Judge Hughes ordered the release of approximately 1,102 individuals. These actions violated Canons 1, 2 A, and 2 B of the Code of Judicial Conduct (1996) and La. Const. art. V, § 25(C) in that Judge Hughes engaged in willful misconduct related to her official duties and persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute.

Charge 0192: Judge Hughes hired Milton Armstead, a convicted felon, as *758 her administrative assistant, and allowed other convicted criminals, including Kim Martin, Melvin Smith, and Wayne Barley, to frequent her court on a regular basis. Kim Martin and Melvin Smith were allowed to use the court's computers to type judgments and given access to confidential juvenile records, despite the fact that they were not employees of the court. Melvin Smith had failed a drug test that precluded his employment. Wayne Barley, an individual with an extensive criminal record, was given unlimited access to Judge Hughes' court and allowed to use the court's telephones to conduct his own private affairs. These actions violated Canons 1, 2 A, and 3 A(2) of the Code of Judicial Conduct (1996) and La. Const. art. V, § 25(C) in that Judge Hughes engaged in willful misconduct related to her official duties and persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute.
Charge 0193: Judge Hughes failed to administer her court in a professionally competent manner by consistently failing to prepare judgments in a timely manner; agreeing to hire a temporary court reporter who could not type judgments with the understanding that the court reporter would pay someone of Judge Hughes' choosing (usually Kim Martin or Melvin Smith) to type the judgments thereby granting persons not employed by the court access to the court's computers and to confidential juvenile records; failing to report to the Supreme Court cases under advisement; failing to ensure the filing of subpoena service returns; failing to provide accurate dockets; consistently beginning court late and working past normal business hours despite an en banc directive from the judges of Orleans Parish Juvenile Court to cease this practice; allowing her case manager to "run the docket" in her absence; continuing court dockets without a reasonable basis for doing so and with little or no notice, frequently holding "court by phone" on such occasions; and conducting hearings without a court reporter present. These actions violated Canons 2 A, 3, 3 A(1), 3 A(2), 3 A(3), 3 A(4), 3 A(7), 3 B(1), and 3 B(2) of the Code of Judicial Conduct (1996) and La. Const. art. V, § 25(C) in that Judge Hughes engaged in willful misconduct related to her official duties and persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute.
Judge Hughes answered these charges on March 14, 2003.
On January 24, 2003, following its preliminary investigation into the allegations that form the basis of the formal Judge Charges, the Commission submitted a recommendation of interim disqualification to this court, recommending that Judge Hughes be immediately disqualified from exercising her judicial functions pending further proceedings by the Commission. By order dated February 12, 2003, this court accepted the Commission's recommendation and disqualified Judge Hughes from exercising any judicial function during the pendency of further proceedings. In re Hughes, 03-0255 (La.2/12/03), 841 So.2d 745.
The Commission conducted its hearing on the merits of the formal charges in two parts. A hearing on the Lawyer Charges proceeded first, followed by a hearing with respect to the Judge Charges. The hearing spanned multiple dates beginning on *759 January 17, 2003, and concluding on July 19, 2003.[3]
On December 12, 2003, the Commission rendered its findings of fact and conclusions of law. It ultimately concluded that Judge Hughes' conduct violated Canons 1, 2 A, 2 B, 3 A(1), 3 A(3), 3 A(4), 3 A(7), 3 B(1), and 7 B(1)(a)[4] of the Code of Judicial Conduct and La. Const. art. V, § 25(C). Pointing out that while Judge Hughes had good intentions and a sincere desire to help children in crisis, the Commission nevertheless found that "[t]he message resonating from all the proven charges is that Judge Yvonne Hughes does not respect the rule of law. While as a lawyer and later a judge she should have been one of the keepers of the rulesit was proven that instead she manipulated the rules, she engaged in delaying tactics, and she often flatly ignored the rules. Such an individual should not remain on the judicial bench." A majority of the members of the Commission therefore recommended: (1) that Judge Yvonne Hughes be removed from judicial office; (2) that Judge Yvonne Hughes be ordered to reimburse and pay to the Commission the amount of $20,293.12 in costs; and (3) that the Louisiana Supreme Court forward the record in these proceedings to the Lawyer Disciplinary Board for consideration of Yvonne Hughes' conduct and how it bears on whether she should retain her license to practice law.

JURISDICTION AND BURDEN OF PROOF
This court is vested with exclusive original jurisdiction in judicial disciplinary proceedings by La. Const. art. V, § 25(C), which provides:
On recommendation of the judiciary commission, the supreme court may censure, suspend with or without salary, remove from office, or retire involuntarily *760 a judge for willful misconduct relating to his official duty, willful and persistent failure to perform his duty, persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, conduct while in office which would constitute a felony, or conviction of a felony. On recommendation of the judiciary commission, the supreme court may disqualify a judge from exercising any judicial function, without loss of salary, during pendency of proceedings in the supreme court. On recommendation of the judiciary commission, the supreme court may retire involuntarily a judge for disability that seriously interferes with the performance of his duties or that is or is likely to become permanent. The supreme court shall make rules implementing this Section and providing for confidentiality and privilege of commission proceedings.
Pursuant to its supervisory authority over all lower courts, this court adopted the Code of Judicial Conduct, effective January 1, 1976, and amended July 8, 1996. The Code is binding on all judges, and violations of its Canons can, without more, serve as the basis for the disciplinary action provided for by La. Const. art. V, § 25(C). In re Hunter, 02-1975, p. 3 (La.8/19/02), 823 So.2d 325, 327-28; In re Jefferson, 99-1313, p. 3 (La.1/19/00), 753 So.2d 181, 184-85; In re Bowers, 98-1735, p. 7 (La.12/1/98), 721 So.2d 875, 879; In re Quirk, 97-1143, p. 4 (La.12/12/97), 705 So.2d 172, 176; In re Marullo, 96-2222, p. 3 (La.4/8/97), 692 So.2d 1019, 1021; In re Decuir, 95-0056, p. 7 (La.5/22/95), 654 So.2d 687, 692.
The charge or charges against a judge must be proved by clear and convincing evidence before this court can impose discipline. In re Hunter, 02-1975 at 3, 823 So.2d at 328; In re Bowers, 98-1735 at 7, 721 So.2d at 880; In re Johnson, 96-1866, p. 7 (La.11/25/96), 683 So.2d 1196, 1199; In re Huckaby, 95-0041, p. 6 (La.5/22/95), 656 So.2d 292, 296. This standard requires that the level of proof supporting the charge or charges against a judge must be more than a mere preponderance of the evidence, but less than beyond a reasonable doubt. In re Hunter, 02-1975 at 4, 823 So.2d at 328; In re Bowers, 98-1735 at 7, 721 So.2d at 880; In re Quirk, 97-1143 at 4, 705 So.2d at 176; In re Huckaby, 95-0041 at 6, 656 So.2d at 296.

ANALYSIS
Because the Judge Charges directly concern the conduct and activities of Judge Hughes in her capacity as a judge of the Orleans Parish Juvenile Court, we first address the merits of those charges and whether the alleged violations were proved by clear and convincing evidence.
Charge 0191: Abuse of parole authority and role of convicted felon Wayne Barley in paroling adult detainees.
In this charge, the Commission alleged that Judge Hughes allowed Wayne Barley, a convicted felon, to operate out of her section of court and act as a conduit for telephone calls from individuals seeking the release of adult detainees from jail. According to the Commission, Mr. Barley would receive a call with respect to an individual being held, call the jail to verify that the individual was in fact being detained, and then deliver the information to Judge Hughes who would in turn call the Sheriff's Office to order the individual's release. In this manner, over a period of two years, Judge Hughes ordered the release of approximately 1,102 individuals. Such conduct, the Commission charged, violates Canons 1, 2 A, and 2 B of the Code of Judicial Conduct and La. Const. art. V, § 25(C)in that it represents willful *761 misconduct relating to Judge Hughes' official duties and persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute.
The evidence adduced at the hearing reveals that Wayne Barley, a convicted felon with an extensive criminal record,[5] frequented Judge Hughes' section of court on a regular, "almost daily" basis. Judge Hughes maintained that Mr. Barley performed personal services for her, such as cleaning up and running errands, for which he was usually paid in cash. He was not a court employee. Witnesses who testified as to his presence in court were unsure of his precise role there. However, these witnesses did confirm that he received phone calls and had unfettered access to the judge's private chambers.
One of Mr. Barley's duties, according to Judge Hughes, was to assist her in arranging for the release of individuals being held in jail on traffic and municipal chargescommonly referred to as parole authority. When Judge Hughes received a call seeking parole of an individual being detained, it was Mr. Barley's role to call the jail to determine whether the arrested individual was still being held. Once this information was obtained, it was delivered to Judge Hughes who would then call the Sheriff's Office and order the individual's release.
Judge Hughes stipulated that, in this manner, from January 2001, through December 2002, she ordered the parole of at least 900 adults. Some were her former clients, including one whom Judge Hughes conceded she might have paroled as many as 30 times. According to Judge Hughes, this practice consumed considerable time so she directed her staff to refer calls involving parole requests to her cell phone, where she could listen to messages during breaks or after hours.
Judge Hughes testified that some of the individuals paroled had ties to juvenile proceedings. As to others, she stated that she interpreted the statutes granting judges the authority to parole persons over whom they have "jurisdiction" to refer to "geographic" jurisdiction, not "trial" jurisdiction. She argued that of the 900 persons paroled, only 200 of the paroles involved instances in which her authority to order a release was questionable, and that her total numbers are only slightly in excess of those of another judge on the juvenile court (100 more). She insisted that neither she nor anyone else received anything of value in exchange for paroling someone.
Following its consideration of the evidence and testimony, the Commission concluded that it was proved by clear and convincing evidence that Judge Hughes violated Canons 1, 2 A, and 2 B of the Code of Judicial Conduct and La. Const. art. V, § 25(C)in two respects: (1) she allowed a convicted felon to conduct a business from her section of court; and (2) she abused her parole authority by releasing at least 900 adult detainees, many of whom had no connection to any juvenile court proceeding.
We agree with the conclusion that the evidence demonstrates, by clear and convincing proof, that Judge Hughes abused her parole authority to the detriment of her duties on the juvenile court. By virtue of LSA R.S. 15:574.15, Judge Hughes does have authority to parole individuals arrested *762 in New Orleans for municipal and traffic offenses. However, this parole power is expressly limited by statute. Section (A)(2) of LSA R.S. 15:574.15 provides that persons arrested for violations of municipal ordinances defining criminal battery and assault, violations of other municipal ordinances (including criminal trespass, criminal damage to property, or disturbing the peace) that occur at the arrestee's residence or resulting from a domestic dispute, and/or provisions of Article VII, Chapter 42 of the City Code of the City of New Orleans dealing with domestic violence "shall not be eligible for parole by any elected officer." (Emphasis added.) The statute does not exempt judges (who are unquestionably "elected officers") from the enumerated exceptions to the parole power. Its wording is clear and unambiguous. Nevertheless, of the 900 individuals Judge Hughes stipulated to releasing from jail, or at least setting in motion their releases from jail, 120 of those individuals had been arrested for domestic violence violations, 61 had been arrested for battery, 5 for assault, 5 for criminal damage to property (arising from a domestic dispute), 7 for criminal trespass (arising from a domestic dispute), and 10 for disturbing the peace (arising out of a domestic dispute). These releases, or attempted releases, clearly exceeded Judge Hughes' parole authority.[6]
More importantly, however, as Judge Hughes herself conceded, these releases were inconvenient and consumed time more properly devoted to her duties on the juvenile court bench, so much so that she was forced to instruct her staff to refer all calls seeking releases to her personal cell phone in order for her to listen to messages on breaks and after hours. In attempting to parole at least 900 adult arrestees in a two year period, the vast majority of whom had no connection to any juvenile proceeding, Judge Hughes sent a message to the community that she could be relied on to interject herself, and her office, in proceedings over which she had no jurisdiction and which had no connection to juvenile law. Most significantly, as will be discussed, other matters which were clearly within her duties and responsibilities as a juvenile court judge were neglected while she authorized these releases.
We disagree, however, with the Commission's finding that the record establishes, by clear and convincing evidence, that Judge Hughes allowed Wayne Barley to conduct a business from her section of court. While the record is replete with evidence that Mr. Barley was present in Judge Hughes' court on a frequent basis and that he had seemingly unlimited access to the telephones and to Judge Hughes' chambers, and received personal calls on the court's phones, the only evidence that existed as to any business being operated by Mr. Barley was a business card for "Wayne's Referral Service," that Judge Hughes allegedly provided to a former client who had come to her court to complain about a legal matter in which she had been retained as counsel, but for which she had done no work. Judge Hughes maintained that she paid Mr. Barley to perform menial tasks for her and that she referred the former client to him only because he knew how to get in touch with her at all times. There was no evidence offered to refute this testimony. Neither was there testimony from any of the numerous witnesses who attested to
*763 Mr. Barley's regular presence in Judge Hughes' court that Mr. Barley was conducting private business from Section C. We do not believe that the business card, standing alone, establishes by clear and convincing evidence that Wayne Barley was conducting a private business from Judge Hughes' chambers. This is especially true when it is considered that the Commission concluded that there was no clear and convincing evidence establishing that Wayne Barley and Judge Hughes were engaged in a business whereby Judge Hughes accepted money for releasing individuals whose names were provided to her by Mr. Barley. However, we do not believe that it was necessary for the Commission to prove that Mr. Barley was in fact operating a private enterprise out of Judge Hughes' section of court in order to establish an ethical violation.
Canon 2 B of the Code of Judicial Conduct directs that a judge "shall not lend the prestige of judicial office to advance the private interests of the judge or others; nor shall a judge convey or permit others to convey the impression that they are in a special position to influence the judge." The evidence in this case conclusively establishes that Wayne Barley was afforded unlimited access to and use of the judge's chambers; that he had unlimited access to the court's telephones and in fact received personal calls on those phones, although he was not a court employee; that he was present in Judge Hughes' section of court on an "almost daily" basis; and that Judge Hughes distributed his business card to those who needed to contact her. Such conduct establishes, at a minimum, that Judge Hughes violated Canon 2 B's prohibition against lending the prestige of office to advance the private interests of others by conveying or allowing Mr. Barley to convey the impression that he was in a special position to influence the judge.
As a result we find that it was established by clear and convincing proof that Judge Hughes violated Canons 1, 2 A and 2 B of the Code of Judicial Conduct[7] and La. Const. art. V, § 25(C)in that she engaged in willful misconduct relating to her official duties and persistent and public conduct prejudicial to the administration of justice.
Charge 0192: Association with convicted felons.
In this charge, the Commission alleged that Judge Hughes hired a convicted criminal (Milton Armstead) as her administrative assistant and allowed other convicted criminals to frequent her section of court on a regular, if not daily, basis. According to the Commission, Judge Hughes allowed convicted criminals Kim Martin and Melvin Smith to use the court's computers to type judgments and permitted their access to confidential juvenile records, despite the fact that they were not employees of the court and that Melvin Smith had failed a drug test, which precluded his employment by the court. In addition, convicted felon Wayne Barley was afforded unlimited access to the court, including Judge Hughes' private chambers, and to its telephones. Such conduct, the Commission charged, violates Canons 1, 2 A, and 3 A(2) of the Code of Judicial Conduct and La. Const. art. V, § 25(C) in that it represents willful misconduct relating to Judge Hughes' official duties and persistent and public conduct prejudicial to *764 the administration of justice that brings the judicial office into disrepute.
The evidence adduced at the hearing reveals that between May 29, 2001, and September 13, 2002, Judge Hughes employed Milton Armstead as her administrative assistant to perform legal research. Mr. Armstead, who had worked for Judge Hughes in her law practice, had pleaded guilty to auto theft in 1964 and attempted simple burglary in 1973. In addition, he had been convicted of armed robbery in 1975 and sentenced as a multiple offender. As part of her efforts to assist children in crisis, Judge Hughes instituted a practice of ordering children who had pending charges, but who were not being detained or attending school, to report to her court so that she might keep them busy and off the streets. One of Mr. Armstead's responsibilities in juvenile court was to supervise these children.
In addition, Judge Hughes hired as a court reporter a woman who was incapable of typing judgments. Judge Hughes agreed that the court reporter could pay Melvin Smith and Kim Martin to type the judgments.
In 1990, Melvin Smith had pleaded guilty in federal court to one count of distribution of crack cocaine and one count of wilfully concealing a felony. While Judge Hughes testified that she did not recall having any knowledge of Mr. Smith's criminal record, she did admit knowing that he could not be employed by the court because he had failed a drug test. In 1994, Ms. Martin had entered an Alford plea to two counts of obtaining drugs with a false prescription, and had pleaded guilty to forgery in 2000. Judge Hughes was counsel of record for Ms. Martin's co-defendant in the forgery case.
When typing judgments, both Ms. Martin and Mr. Smith, who were not court employees, were given access to the court's computer system and records, including court reporter notes and dockets, as well as the court's "blue files," which contained confidential information regarding juveniles.[8] They were also present in Section C when juveniles were there, although Judge Hughes characterized their interaction with the children as "exaggerated." Judge Hughes eventually disassociated herself from both Ms. Martin and Mr. Smith, but, in the case of Mr. Smith, only after Mr. Smith and Judge Hughes were confronted by the other juvenile court judges who expressed concern about Mr. Smith's possible intimidation of police witnesses.
Finally, as discussed in connection with the previous formal charge, Judge Hughes permitted Wayne Barley to spend lengthy periods of time in Section C. Mr. Barley, whom Judge Hughes described as her "gopher," was given access to the court's computer and telephone systems and to Judge Hughes' courtroom and chambers, even when she was not present. Mr. Barley has an extensive criminal record, consisting of some 16 separate convictions in Orleans, Jefferson, and St. Bernard Parishes between 1977 and 1994. Mr. Barley's crimes include theft, simple burglary, and issuing worthless checks. Prior to assuming judicial office, Judge Hughes represented Mr. Barely on numerous occasions; she was counsel of record for Mr. Barley in at least three of the cases in which he was convicted of committing a crime.
*765 Judge Hughes testified that she believed the ethical restriction against associating with convicted felons applied only to "partying with them" and "doing bad things with them" and that she embraces a presumption of rehabilitation. She stated that she believed that Kim Martin was rehabilitated and felt, although Wayne Barley had a fairly extensive criminal record, that sufficient time had elapsed since his last conviction. She acknowledged the existence of Milton Armstead's prior record, but relied on the fact that the juvenile court had "cleared" him when he was employed as her administrative assistant.
Following its consideration of the evidence and testimony, the Commission concluded that it was proved by clear and convincing evidence that Judge Hughes violated Canons 1 and 2 A of the Code of Judicial Conduct, but not Canon 3 A(2). In addition, the Commission determined that Judge Hughes violated La. Const. art. V, § 25(C) because she engaged in willful misconduct related to her official duty and public conduct prejudicial to the administration of justice that brought her office into disrepute.
We agree with the conclusion that the evidence demonstrates, by clear and convincing proof, that Judge Hughes knowingly associated with convicted felons and by doing so, failed to "participate in establishing, maintaining, and enforcing, and ... personally observ[ing], high standards of conduct so that the integrity and independence of the judiciary may be preserved," and also failed to "comply with the law and... act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Canons 1 and 2 A of the Code of Judicial Conduct. The evidence establishes that Judge Hughes not only allowed individuals with extensive criminal backgrounds to frequent her courtroom, she integrated them into the operation of her court, affording them access to the court's computer system and to confidential juvenile records even though, in the case of Ms. Martin, Mr. Smith, and Mr. Barley, these individuals were not employed by the court. As to Mr. Armstead, we agree with the Commission that perhaps he had been rehabilitated and that his employment in discrete areas of the judicial system might have been appropriate. However, in Judge Hughes' court, Mr. Armstead was assigned to supervise children, placing him "in a position of constant contact with children, some of whom may have viewed him as a role model."
While it is not illegal to associate with known criminals, in In re Haggerty, 257 La. 1, 241 So.2d 469, 478 (1970), a case in which a judge was found guilty of misconduct, in part for associating with a "purported underworld character," we explained that a judge's conduct in this regard "bring[s] disgrace and discredit upon his judicial office and a loss of public respect and confidence in his ability and temperament to perform his duties." Quoting from Stanley v. Jones, 201 La. 549, 9 So.2d 678, 683 (1942), a judicial removal proceeding in which a judge was removed for gross misconduct off the bench, we noted:
The office of judge is one in which the general public has a deep and vital interest, and, because that is true, the official conduct of judges, as well as their private conduct, is closely observed. When a judge, either in his official capacity or as a private citizen, is guilty of such conduct as to cause others to question his character and morals, the people not only lose respect for him as a man but lose respect for the court over which he presides as well.
In re Haggerty, 241 So.2d at 478.
We elaborated on this concept in In re Whitaker, 463 So.2d 1291, 1303 (La.1985), *766 wherein we explained: "Respondent, while an attorney, could not choose only lawabiding citizens as his clients, but when he became a judge, he was required to avoid any personal association with persons known for criminal activities. His intentional association with [such individuals] was prejudicial to the administration of justice and brought discredit to the judicial office."
In this instance, Judge Hughes' association with convicted criminals did not involve activities outside of the courtroom, as was the case with both Judges Haggerty and Whitaker. Rather, Judge Hughes' association with criminals occurred while she performed her judicial duties and exposed her staff, the court's staff, and the children who came before her to individuals of dubious character. By direct employment and other loosely defined arrangements with Mr. Armstead, Mr. Smith, Ms. Martin, and Mr. Barley, Judge Hughes allowed four individuals with substantial criminal records access to the court's telephone and computer systems, confidential files and other confidential information. She also condoned the interaction of these individuals with the children over whom she exercised jurisdictionthose children most in need of guidance and direction. Such conduct "causes disrespect for the judiciary and falls below the standard the public has a right to expect." In re Harris, 98-0570, p. 7 (La.7/8/98), 713 So.2d 1138, 1141 (judge disciplined for engaging in an intimate relationship with a convicted felon whom she sentenced in her court).
Therefore, we find that it was established by clear and convincing proof that Judge Hughes intentionally associated with convicted felons, in violation of Canons 1 and 2 A of the Code of Judicial Conduct and La. Const. art. V, § 25(C,) engaging thereby in willful misconduct relating to her official duties and persistent and public conduct prejudicial to the administration of justice that brought her judicial office into disrepute.
Charge 0193: Administrative failures and irregularities in operation of court.
In this charge, the Commission alleged that Judge Hughes failed to administer her court in a professionally competent manner by: (1) consistently failing to prepare judgments in a timely manner; (2) engaging persons who were not court employees and who performed inadequate and substandard work to type judgments and granting them access to confidential information; (3)failing to report cases under advisement to the Louisiana Supreme Court; (4) failing to ensure the filing of subpoena service returns; (5) failing to ensure the accuracy of docket sheets; (6) consistently beginning work late and working past normal business hours despite an en banc directive from the judges of the Orleans Parish Juvenile Court to cease this practice; (7) allowing the case manager to "run the docket" in the judge's absence; (8) continuing court dockets without a reasonable basis for doing so and with little or no notice, frequently holding "court by phone" on such occasions; and (9) conducting hearings without a court reporter present. Such conduct, the Commission charged, violates Canons 2 A, 3, 3 A(1), 3 A(2), 3 A(3), 3 A(4), 3 A(7), 3 B(1), and 3 B(2) of the Code of Judicial Conduct and La. Const. art. V, § 25(C) in that it represents willful misconduct relating to Judge Hughes' official duties and persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute.
The evidence adduced at the hearing reveals that judgments in Orleans Parish Juvenile Court are similar to the minute entries generated in other Louisiana courts. It was explained that the timely and accurate preparation of these judgments *767 is essential if a case is to advance through the legal system. The judgment officially establishes the next court date and triggers the issuance of subpoenas for the attendance of critical witnesses. The judgment provides evidence that the necessary procedural steps were taken in a particular case. The absence of a judgment may result in an unnecessary continuance and/or dismissal of a case, jeopardizing the availability of federal funds to children in need of foster care. Karen Hallstrom, Deputy Judicial Administrator for the Supreme Court, testified that she explained to Judge Hughes in detail the procedural checklist that the federal government requires for compliance with the Adoption and Safe Families Act, 42 U.S.C. § 601 et seq. Judge Hughes acknowledged the importance of maintaining accurate records for these purposes, the evidence establishing that a lack of compliance jeopardizes federal funds not only for the individual child who may be declared ineligible for funds during his or her entire stay in foster care, but for the entire state, as the federal government conducts periodic audits to review the state's compliance with its directives.
On November 19, 2002, the Office of Special Counsel served an instanter subpoena on Judge Hughes' section of court, seizing five crates or boxes containing juvenile records. Examination of these records revealed over 250 judgments remained to be prepared. Of those outstanding judgments, eighty were more than four months old; some were over one year old.[9]
One reason for the backlog in judgments became readily apparent at the hearing. Judge Hughes failed to secure the services of a competent court reporter. In 2002, Judge Hughes hired Lana L'Enfant as a temporary court reporter. Ms. L'Enfant was incapable of preparing judgments. Therefore, Judge Hughes agreed that she could pay all or some portion of the funds she received every day for someone of Judge Hughes' choosing to type the judgments. Ms. L'Enfant would pay the typists cash or write a check to the individual directly, or to cash. Subsequently, when it was discovered that the typists were not preparing the judgments for which they were being paid, she began writing checks directly to Judge Hughes who would then pay the typists when the work was completed. Two of the persons who were paid in this fashion were Melvin Smith and Kim Martin, who were not employees of the court and whose criminal records were discussed in connection with Charge 0192, *768 supra. Testimony at the hearing revealed that Ms. Martin did a particularly poor job in preparing the judgments, which often had to be corrected.
Despite the backlog in the preparation of judgments, Judge Hughes listed no cases under advisement between January 2001 and December 2002 in the reports judges are required to submit to the Supreme Court Judicial Administrator's Office. Judge Hughes explained that she did not consider a case to be under advisement if she had actually decided the matter and all that remained to be done was to prepare a judgment. In her defense, she pointed out that the Juvenile Court Clerk of Court, who also signed the reports, failed to question her submissions and no other judge on the court told her she was filling out her reports incorrectly.
Also as a result of the backlog in preparing judgments, court files that should have been returned to the clerk's office remained in Section C where they were stored in anywhere from ten to fifteen postal mail bins scattered throughout the courtroom and the judge's offices. The situation was described as "chaos." One assistant district attorney complained to the Commission: "I couldn't even sit down at the table ... because there would be three, or four, or five boxes of files under my desk, alone." Ardell Freeman, a docket clerk for Section C, testified that difficulties in locating files created problems with docketing and the timely issuance of subpoenas. Eventually, a phrase was coined to describe the files accumulating in Judge Hughes' sectionthey were described as "lost at C."
The record reveals that subpoena service returns were not always filed into the records in Judge Hughes' court, and there were problems with the issuance of subpoenas. While testimony revealed that it was not the judge's responsibility to ensure that subpoena returns were properly filed, the failure of records to reflect service on individuals created problems and further delays when cases came up for disposition. In addition, Judge Hughes had a practice of setting cases on her docket frequently, further crowding her docket and requiring the repeated issuance of subpoenas. This practice eventually prompted a complaint from the civil sheriff who expressed concern over the safety of the process servers who were being asked to serve subpoenas on persons angry that their presence was being repeatedly required.
The evidence additionally demonstrated that the docket sheets used in Judge Hughes' section of court were often inaccurate and contained errors. Cases that should have appeared on the docket were often omitted and other cases were set in error. This created a problem for individuals who appeared in court pursuant to subpoenas only to discover that their cases had not been scheduled. As to the further effect of these docketing errors, one assistant district attorney testified:
[T]wo cases were set for trial. They weren't on the docket, which means there was either a missing judgment or one that didn't reflect that that was a trial date, so no subpoenas went out....
It does create a problem because under the Children's Code you have a very, very limited time amount to bring a case to trial, to bring a case to adjudication, and errors of this nature that just, like, let cases fall off the face of the earth, basically, by the time they correct the error you're way outside your time limits, and then any halfway-good defense attorney can walk in, and go, "Well, this case is expired."
And I had that happen to me on several occasions. Due to the fact of the inefficiency of the way that the court *769 was run, cases fell off the docket, and I had to explain to two victims of armed robbery that someone ... just let this case drop off the docket, and now the time's expired and the case has been dismissed.
These docketing errors were compounded by the fact that Judge Hughes kept erratic hours and repeatedly conducted court proceedings outside of the court's established business hours. She often started court late in the morning or after lunch, which created problems for those who were required to report to court at 8:30 a.m.the parties, the lawyers, the witnesses, the police officers, and those responsible for transporting juveniles to and from court. Judge Hughes also kept court in session after closing time, resulting in court staff having to work overtime, generally without the benefit of compensatory time or overtime pay. Judge Hughes' frequent failure to observe court hours disrupted the entire Orleans Parish Juvenile Court to such a degree that the judges of the court issued an en banc directive to Judge Hughes affirming the court's regular business hours of 8:30 a.m. to 4:30 p.m. Judge Hughes received and signed the en banc directive on August 27, 2001. The next day she convened court at 12:35 p.m. and continued to begin court late on a regular basis, sometimes as late as 2:30 p.m.
Because of the problems the late starting times were causing for the district attorney's office, the assistant district attorneys in Judge Hughes' court began keeping daily logs reflecting the time court began and ended, who was present, and the number of cases moved. These logs were entered into evidence, along with testimony from the assistant district attorneys who attested to the difficulties the erratic working hours created, particularly with regard to securing and scheduling witnesses. Assistant District Attorney Lynn Quinley explained:
Well, it was a problem because the witnesses had been subpoenaed to be in court for 8:30, 9:00, 9:30, whatever time they were subpoenaed for, and when we began late the witnesses just had to sit around, and they didn't like it.
I had one case where the witnesses, the victim and her family, waited all day, and we never did get to do that trial. Those people were so fed up that I couldn't even get them on the phone after that. They would not come back in[.]
Judge Hughes explained to the Commission that she scheduled status hearings late in the day to accommodate working parents and children who were in school. Aside from those hearings, she believed that "court is an all-day thing" and those who received subpoenas had to plan to spend the day.
Several witnesses before the Commission criticized Judge Hughes for continuing entire court dockets without any reasonable basis for doing so and with little or no prior notice to staff, witnesses, court personnel, and others having business before the court. On such occasions, witnesses reported that it was common for Judge Hughes to hold "court by phone," whereby the court staff would handle the docket without Judge Hughes being present. Judge Hughes would call in and speak with her case manager, Pam Angel, to direct the proceedings, which primarily involved status hearings.
Witnesses likewise reported that if Judge Hughes could not obtain the services of a court reporter, she would sometimes conduct court anyway, using a tape recorder. Summary proceedings, detention hearings, contempt of court hearings, and trials were conducted in this manner, although there was testimony that Judge *770 Hughes would not accept a guilty plea from a defendant if there was no court reporter present.
Judge Hughes defended her practice in this regard, explaining that in order to move the docket, and by agreement with counsel, the tape recorder was used, basically for status hearings and re-settings. She testified that she had heard in en banc meetings with other judges on her court that Jefferson Parish Juvenile Court used a tape recording system in lieu of court reporters, but ultimately acknowledged that the Jefferson Parish system was much more sophisticated than the one she employed.
Finally, several witnesses before the Commission criticized the abilities of the employees hired by Judge Hughes. Among these, court reporter Bonnie Wagner testified that case manager Pam Angel failed to compile statistics about delinquency cases, which jeopardized a juvenile court grant. Judge Hughes testified about persons hired for her section of court and the drug court, including an individual by the name of Willis Glover, whose address matched her own and who she described as her roommate, although she denied any romantic involvement. Mr. Glover was hired as the compliance officer of the drug court after Judge Hughes "talked about it" with the director. According to Judge Hughes, Mr. Glover had previously worked as a bank clerk, knew how to fix cars, and "was apparently an electrician."
Judge Hughes testified that she thought some of the problems in her court arose because she was "sabotaged." Among the persons Judge Hughes blamed were court reporter Bonnie Wagner (who refused to type judgments in which she had not been the reporter), docket clerk Erica Hampton (an employee of the clerk's office who was allegedly incompetent), lawyers from the Office of the Indigent Defender (who would not be in court when she was ready to start her docket), other judges on her court (who hired away her employees), and the court's computer systems manager (who blocked her "full access" to the system). Nevertheless, Judge Hughes testified that she accepts responsibility for the problems in her court prior to her interim disqualification. Judge Hughes told the Commission that she believes she can return to her section of court and keep up with the necessary tasks, and that she had already made great strides toward doing so (including catching up with her backlog of judgments) prior to her interim disqualification. Judge Hughes reported that what she really wants to do "is to help the children, and I can't help them if I'm not on the bench. I would like to be given that opportunity."
Following its consideration of the evidence and testimony, the Commission concluded that it was proved by clear and convincing evidence that Judge Hughes failed to administer and manage her section of court in a competent manner and that such conduct violated Canons 1, 2 A, 3 A(1), 3 A(3), 3 A(4), 3 A(7), and 3 B(1) of the Code of Judicial Conduct, but not Canons 3 A(2) or 3 B(2). In addition, the Commission concluded that Judge Hughes violated La. Const. art. V, § 25(C), finding that she engaged in willful misconduct relating to her official duty and persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute.
We agree with the conclusion that the evidence unquestionably demonstrates, by clear and convincing proof, that Judge Hughes failed to administer her section of court in a competent manner and that these failures violate the enumerated Canons of the Code of Judicial Conduct, as well as La. Const. art. V, § 25(C). Among *771 the documented administrative failures: Judge Hughes failed to assure that judgments, which should not have been difficult to prepare,[10] were prepared in a timely manner; she thereby jeopardized federal funding for any juvenile appearing before her who was a candidate for foster care, and further, by such procrastination, delayed badly needed social or other services.[11] As a consequence of the backlog in judgments, files that should have been returned to the clerk's office for processing remained in section C piled in crates or boxes scattered throughout the offices, creating confusion and disarray. The difficulty in locating records caused problems in docketing; thwarted the timely issuance of subpoenas; and as a consequence, produced unnecessary delays, continuances, and in at least one instance, dismissals as cases fell off the docket. Adding to the disarray in moving cases was Judge Hughes' failure to ensure matters that should have been in the record, such as subpoena service returns, were actually in the record. Clearly, although filing was not one of Judge Hughes' responsibilities, she was responsible for ensuring her section functioned in a competent manner. Her failure to address the problem with respect to subpoena service returns is illustrative of a pattern of management shortcomings that reflects adversely on her competence as a judge and administrator, in violation of Canons 1, 2 A, 3 A(1), 3 A(7), and 3 B(1) of the Code of Judicial Conduct.[12]
Judge Hughes' administrative shortcomings were compounded by her failure to observe regular hours, the evidence demonstrating that she sometimes started court as late as 2:30 p.m. and continued well past the normal 4:30 p.m. closing time, occasionally canceling entire dockets with little or no prior notice. While some flexibility in the hours of a court's operation may be warranted and even desirable, Judge Hughes' practices negatively impacted many participants in the juvenile court process and severely inconvenienced witnesses. Her erratic hours had the potential of exposing the court to claims under the Fair Labor Standards Act. The fact that the judges of her court, as a group, decided to notify her in writing of the regular business hours of the juvenile court in and of itself demonstrates the significance of the problem. The fact that Judge Hughes started court at 12:35 p.m. the day following her receipt of the judges' communication speaks volumes about her unwillingness and inability to cooperate with the needs of the court as a whole. Her violation of Canon 3's directive that judicial duties "take precedence over all other activities," and Canon 3 B(1)'s charge that a judge "should cooperate with other judges and court officials in the administration of court business" was fully proved.
*772 Further, the evidence establishes that Judge Hughes engaged in two particularly questionable practices: allowing her staff to "run the docket" in her absence and conducting "court by phone." Judge Hughes acknowledged that she employed these practices, but maintained that she primarily handled status hearings and re-settings in this manner. Regardless of the matter being resolved, the practice is a dubious one. For staff members to "preside" in the judge's absence, even if the judge is available by phone, undoubtedly gives the appearance that someone other than the judge is the decision maker. Compounding matters further, the evidence demonstrates that when no court reporters were available, Judge Hughes conducted court proceedings without a court reporter present or without a trustworthy court reporting system, thereby conducting a court of record without any reliable record being assured, all in clear violation of Canons 1, 2 A, 3 A(1), and 3 B(1) of the Code of Judicial Conduct.
The evidence further reveals that Judge Hughes' demonstrated administrative failures extend to her questionable hiring practices. The backlog in judgments is directly attributable to Judge Hughes' failure to secure the services of a court reporter who could actually do the job. Judge Hughes had available two positions. Instead of hiring two court reporters, or at least one court reporter who could perform the work, Judge Hughes hired convicted felon Milton Armstead as an administrative assistant to oversee children she ordered to attend court and, at least temporarily, Lana L'Enfant. Judge Hughes' practice of allowing Ms. L'Enfant to perform only half the court reporting job, and then divide the pay with typists who were friends of Judge Hughes violates the Code of Judicial Conduct. So, too, does her role in securing the employment of her "roommate" as compliance officer for the drug court. Judge Hughes had responsibility for overseeing the court, and the hiring of Mr. Glover created the appearance of favoritism, as he had few, if any, skills associated with the job. Further, the evidence establishes that Melvin Smith and Kim Martin were incapable of typing judgments in an acceptable manner and that case manager Pam Angel failed to keep statistics, which would have jeopardized a federal grant. These hiring practices violated Canons 1, 2 A, 3 A(4), and 3 B(1) of the Code of Judicial Conduct.
Finally, the record establishes that despite Judge Hughes' backlog in judgments, she failed to list any cases as being under advisement during her entire tenure on the bench. Such conduct was in clear violation of LSA-R.S. 13:4207 and La. Sup. Ct. Rule, Part G § 2, which specifically imposes a requirement that judgments be signed expeditiously.[13] Judge Hughes' failure to render decisions timely and to *773 comply with the reporting requirements of this court is grounds in and of itself for imposing judicial discipline. See, In re Sharp, 03-2256 (La.10/29/03), 856 So.2d 1213 (suspending a judge for 60 days without pay for failing to render a decision timely and for not listing cases under advisement on his reports to this court); In re Wimbish, 98-2882 (La.4/13/99), 733 So.2d 1183 (censuring a judge for failing to render timely decisions in 56 cases and failing to report 7 of those cases to the Judicial Administrator as required by La. Sup.Ct. Rule, Part G § 2). See also, In re Emanuel, 98-3142 (La.4/13/99), 755 So.2d 862; In re Tuck, 96-1444 (La.11/25/96), 683 So.2d 1214.
Recently, in In re Hunter, 02-1975 (La.8/19/02), 823 So.2d 325, this court removed a judge for reasons stemming from administrative incompetence evidenced by poorly organized case files, missing portions of records, poorly drafted or non-existent minute entries, unsigned motions for appeal, cases that had "fallen off the docket," and failure to produce transcripts for appellate review which resulted in the reversal of serious criminal convictions. Judge Hughes, while acknowledging the administrative problems in her section of court and accepting responsibility therefor, argues that her shortcomings do not rise to the level of mismanagement encountered in Hunter and, as a result, do not constitute judicial misconduct, because there is no proof of any harm, such as reversals or actual loss of federal funds, resulting from her actions.
This argument can only be described as presenting a very myopic view of the record and a very limited appreciation of the rules that direct judicial conduct. Certainly there was no proof that Judge Hughes' shortcomings resulted in the reversal of serious criminal convictions or actual loss of federal funds to any particular child. However, there was testimony establishing that cases were dismissed and witnesses lost because of the manner in which Judge Hughes administered her court. There was also extensive testimony respecting the extent to which her conduct reflected adversely on the public perception of the judicial system. As Assistant District Attorney Scot Koloski testified:
I learned that how court was conducted in there is not how it's conducted elsewhere. I mean, sure, sometimes other judges don't take the benchmaybe they're not there at 9:00 sharp, but they'll start court at 9:30 or 9:45, even. But, you know, I'd never been in a section of court that starts at noon or 1:00 o'clock in the afternoon.
And things just seemed not veryThe decorum of the courtroom I guess is the way to put it, it just ... wasn't a formal process.... I mean, the minute clerk would be eating something, and there's a food guy outside, and the judge would buy food and eat on the bench, and, I mean there was all kind of commotion going on....
We could be having some kind of hearing, whether a detention hearing, or what-not, and someone's yelling at the other one on the other side of the room, back and forth, and there's commotion in the back, and it was just very confusing. To a person that had never dealt with anything like that, I could see how they'd be confounded.
In observing irregular hours, failing to timely prepare judgments, canceling dockets with little or no notice, conducting court "by phone" and/or allowing her staff to "run the docket" in her absence, Judge Hughes' conduct on the bench demonstrated a lack of regard and respect for victims, witnesses, and all who came before her seeking justice; indeed, for the judicial system itself. While the Commission noted *774 that Judge Hughes appeared to be motivated by a genuine desire to help children, it also found that her commitment in this regard was exercised at the expense of her judicial responsibilities. We agree with that conclusion and with the finding that Judge Hughes' administrative failures, all proved by clear and convincing evidence, constitute willful misconduct relating to Judge Hughes' official duties and persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute in violation of La. Const. art. V, § 25(C).
In conclusion, and as a result of the foregoing analysis, we find that the charges related to her judicial service were proved by clear and convincing evidence and that those charges established violations by Judges Hughes of Canons 1, 2 A, 2 B, 3 A(1), 3 A(3), 3 A(4), 3 A(7), and 3 B(1) of the Code of Judicial Conduct and the prohibition of La. Const. art. V, § 25(C) against willful misconduct relating to a judge's official duties and persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute.
The Lawyer Charges: Charges 0162-0176.
As discussed earlier, the Lawyer Charges concern alleged misconduct that occurred primarily, but not entirely, before Judge Hughes assumed office, regarding acts committed in her capacity as an attorney, the majority of which were originally charged by the Office of Disciplinary Counsel of the Louisiana State Bar Association, which lost jurisdiction of these matters upon Judge Hughes' assumption of office.[14] As a predicate to discussing these charges, we address Judge Hughes' contention that these charges, stemming from acts committed in her capacity as an attorney, have no relevance to her performance on the bench and, therefore, should not be the subject of the instant proceeding.
The challenge raised by Judge Hughes in the instant case was previously addressed by this court in In re Whitaker, 463 So.2d 1291 (La.1985). Therein, in holding that the conduct of a judge prior to his or her assuming office generally cannot form the sole basis for disciplinary proceedings before the Commission, we noted that evidence of conduct prior to induction into office may, nevertheless, be relevant to the question of the extent of disciplinary sanction to be imposed. We recognized, therefore, that "[t]o the extent that evidence of conduct prior to induction into office shows a pattern of misconduct, such evidence is relevant and probative on the issue of appropriate sanction." In re Whitaker, 463 So.2d at 1295.
We elaborated on this principle in In re Huckaby, 656 So.2d at 296 n. 3, explaining:
We recognized in Whitaker that a judge's conduct before he assumes office cannot form the "sole basis" for disciplinary proceedings before the commission. See Whitaker, 463 So.2d at 1294. However, in this case, it is undisputed that respondent's conduct continued through his assumption of judicial office. Therefore, because the charge against him is not based solely on pre-judicial conduct, respondent's pre-judicial conduct, in this case, can be used to determine the appropriate measure of discipline because that conduct was proven by clear and convincing evidence.
In the instant case, the Commission filed fifteen formal charges against Judge Hughes arising out of attorney conduct. Four of those charges, Nos. 0163, 0165, 0167, and 0171, involved alleged misconduct *775 that occurred while Judge Hughes was a lawyer and that did not continue into her tenure as a judge. Consistent with Whitaker, these charges were considered by the Commission only insofar as they establish a pattern of misconduct. Nine of the remaining charges, Nos. 0164, 0166, 0169, 0170, 0172, 0173, 0174, 0175, and 0176, involved complaints in which Judge Hughes failed to account to her former clients and/or failed to return unearned fees. This failure to account continued after her assumption of judicial office, bringing her misconduct within the Commission's jurisdiction. In re Huckaby, 656 So.2d at 296 n. 3. The final formal charge, No. 0162, concerns campaign misconduct occurring while Judge Hughes was a candidate for judicial office. Canon 7 of the Code of Judicial Conduct confers on the Commission jurisdiction over this charge.[15]
Therefore, we find that the formal Lawyer Charges were properly before the Commission and can properly be considered in this instance "to determine the appropriate measure of discipline" if those charges were proved by clear and convincing evidence. In re Huckaby, 656 So.2d at 296 n. 3. Judge Hughes' argument to the contrary is without merit.[16]
Charge 0162: Campaign finance reporting violations.
In this charge, the Commission alleged that in the fifteen elections in which she participated as a candidate for elective office since 1988, Judge Hughes repeatedly failed to file the required campaign finance disclosure reports within the statutory deadline, resulting in fines and penalties totaling $48,300.00 by November 2000, and the institution of garnishment proceedings to enforce and collect the unpaid penalties. The outstanding fines were ultimately resolved in a compromise between Judge Hughes and the Board of Ethics reducing the outstanding unpaid fines to $14,000.00 to be paid pursuant to garnishment proceedings. Such conduct, the Commission charged, violates the Campaign Finance Disclosure Act, LSA R.S. 18:1481 et seq., and in particular, R.S. 18:1495.4, 18:1505.1, and 18:1505.4, as well as Canons 1, 2 A, and 7 B(a) of the 1976 Code of Judicial Conduct, Canons 1, 2 A, and 7 B(1)(a) of the 1996 Code of Judicial Conduct, and La. Const. art. V, § 25(C) in that the actions were willful misconduct relating to the judge's official duty and persistent and public conduct prejudicial to *776 the administration of justice that brought the judicial office into disrepute.
The evidence adduced at the hearing on this formal charge reveals that between March 1988, and October 2000, Judge Hughes was a candidate in fifteen different elections for public office, thirteen of those elections involving candidacies for judicial office. In connection with those elections, Judge Hughes repeatedly failed to file the required campaign finance disclosure reports within the statutory deadline. In some cases, the reports were filed as late as one year after their due date.
Maris LeBlanc McCrory, a 17-year attorney with the Louisiana Board of Ethics, testified as to Judge Hughes' violations and the penalties assessed therefor. She verified that by November 2, 2000, Judge Hughes owed the Board of Ethics $49,400.00 in fines and fees for filing late reports. According to Ms. McCrory, Judge Hughes "had the most violations that I've seen in my history with the Board.... She's run in more elections than any candidate and she's been late with reports in every single one of those elections, and, consequently, the amount of the fines has been significant."
In early 2001, with the fines unpaid and efforts to collect them proving fruitless, the Board of Ethics instituted proceedings to have prior judgments against Judge Hughes made executory and her wages as a judge garnished. Pursuant to a judgment of the Orleans Parish Civil District Court dated June 5, 2001, Judge Hughes' wages, in the amount of $1,363.80 per pay period, were garnished to satisfy a $10,000.00 judgment that had been made executory. In separate proceedings instituted in the 19th Judicial District Court, Judge Hughes and the Board of Ethics entered into a settlement of the remaining unpaid fines, Judge Hughes agreeing to pay (pursuant to garnishment) $13,000.00 of the remaining $39,000.00 owed. The proceedings garnered extensive media coverage.
Judge Hughes admitted that she did not file campaign finance reports in a timely manner, but defended her dilatoriness by implying that little or no harm resulted because many of the reports, when filed, showed minimal or non-existent campaign activity. Judge Hughes expressed remorse for her conduct, but testified that she felt that having to pay $23,000.00 of her own funds was sufficient punishment for her recalcitrance.
Following its consideration of the evidence and testimony, the Commission concluded that it was proved by clear and convincing evidence that Judge Hughes engaged in a pattern and practice of repeatedly filing legally required campaign finance disclosure reports after the statutory deadlines, in violation of the Campaign Finance Disclosure Act, LSA R.S. 18:1481 et seq., and in particular La. R.S. 18:1495.4, 18:1505.1 and 18:1505.4. The Commission additionally found that the manner in which Judge Hughes continually failed to comply with the law of Louisiana created Canons 1, 2 A and 7 B(1) violationsviolations that spanned the effective dates of both the 1976 and 1996 Codes of Judicial Conduct.[17] Finally, the Commission concluded that Judge Hughes' conduct violated La. Const. art. V, § 25(C) *777 in that the widespread media attention attached to her conduct and the ensuing garnishment proceedings presented the judiciary as a whole in a negative light.
We agree with the Commission's conclusion and find the misconduct charged was fully proved. Campaign finance disclosure laws were promulgated because the legislature recognized "that the effectiveness of representative government is dependent upon a knowledgeable electorate and the confidence of the electorate in their elected public officials." LSA-R.S. 18:1482. Judge Hughes admitted that she did not file campaign finance reports in a timely manner, but implied that there was little harm because no financial activity occurred. We reject this contention. Insofar as assuring an informed electorate is concerned, filing a report of no campaign activity is just as important as disclosing contributions. Moreover, we find, as did the Commission, that "as a lawyer and later as a sitting judge, Judge Hughes should have been obeying the law instead of ignoring it because she regarded it as insignificant or burdensome." Judge Hughes' proven violations of the campaign finance disclosure law constitute breaches of Canon 1 of the Code of Judicial Conduct, which requires that a judge uphold the integrity and independence of the judiciary, and Canon 2 A, which requires that a judge respect and comply with the law, as well as Canon 7 B(1)(a). Further, the documented media attention that ensued after the events put into motion by Judge Hughes' conduct brought the judiciary as a whole into disrepute, resulting in a violation of La. Const. art. V, § 25C().
Charge 0165: The notary matter.
In this charge, the Commission alleged that after having her notarial commission suspended, Attorney Hughes continued to hold herself out as a notary and to perform notarial services. Such conduct, the Commission charged, violates Rule 8.4(c) of the Rules of Professional Conduct, Canons 1 and 2 A of the Code of Judicial Conduct and La. Const. art. V, § 25(C) in that the actions were persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute.
The evidence adduced at the hearing on this charge established that in May 1994, Attorney Hughes' notarial commission was suspended for failure to comply with an order to provide an annual statement and to pay annual fees. That commission has never been reinstated. Nevertheless, she continued to hold herself out as a notary public.
In particular, in April 1996 someone in Attorney Hughes' law office signed a client's name to an affidavit of pauper status, then signed Attorney Hughes' name as notary. Although acknowledging responsibility for the acts of her employees, she defended the allegation that employees in her office might have been misusing her notarial seal by pointing out that she did not charge for notarial services, which were performed as a form of pro bono work.
On August 1, 1997, Attorney Hughes sent a letter to the Office of Disciplinary Counsel on stationery that identified her as "attorney and notary." She defended this action by testifying that she was a notary in Mississippi. When confronted with documents disproving this assertion, she stated that she believed she was a notary in Mississippi by virtue of being admitted to the Mississippi bar. She then noted that a template in her WordPerfect program included her title as "notary public" in two places, and that she must have only corrected the reference on her letterhead, *778 inadvertently leaving the "notary public" reference in her signature line.
Following its review of the evidence and testimony, the Commission concluded that it was proved by clear and convincing evidence that Attorney Hughes violated the Rules of Professional Conduct applicable to lawyers, and in particular, Rules 8.1(c) (failure to cooperate with the Office of Disciplinary Counsel in its investigation) and 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit or misrepresentation). The Commission did not find violations of the Code of Judicial Conduct, but did conclude that Attorney Hughes engaged in "persistent and public conduct prejudicial to the administration of justice that bring the judicial office into disrepute," in violation of La. Const. art. V, § 25(C).
We agree with the Commission's findings in this matter and find its comments with respect to her conduct particularly appropriate:
Judge Hughes' testimony about Case No. 0165, with regard to misuse of her notarial commission was disturbing and reflected her disregard for the law. First, Judge Hughes' statements showed no recognition that a notary's signature is critical to our legal system. She failed to comprehend (or if she understood, to care) that a notarized document is accepted as proof that the person who purportedly signed a document did so, and that as a result, such document enjoys legal effect. Judge Hughes emphasized in her testimony that she performed notarial services pro bono, which completely missed the point that her negligence ... allowed persons to falsely sign her name and the name of a client, Ms. Chambers, to an affidavit. Further, Judge Hughes wrongly continued to hold herself out as a notary when her notarial commission had been revoked. She claimed the template in her computer program was erroneously changed in only one of two places on her letterhead referencing her as a notary public. Curiously, that reference to her being a notary was in her signature line. If Judge Hughes' testimony is to be believed, the Commission had to accept that she didn't see her title as notary each time she signed her name.... Further, until proof to the contrary was introduced into evidence, Judge Hughes falsely maintained that she was a commissioned notary in the State of Mississippi. Judge Hughes was not credible in her testimony as to this charge, and her telling the Commission she accepted responsibility for misuse of her notarial commission does not affect the ethical violations that were proven.
Charge 0168: The Donald Jones matter.
In this charge, the Commission alleged that Donald Jones retained Yvonne Hughes to represent him in a criminal matter and paid her $2,100.00. Thereafter, Ms. Hughes failed to keep her client informed about his case, failed to make any court appearances on his behalf, failed to file any pleadings, and failed to refund any portion of the unearned fee or provide an accounting. Such conduct, the Commission charged, violates Rule 1.3, 1.4(a), and 1.5(f)(6) of the Rules of Professional Conduct, Canons 1 and 2 A of the Code of Judicial Conduct, and La. Const. art. V, § 25(C) in that the actions were persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute.
The evidence adduced at the hearing reveals that Mr. Jones retained Yvonne Hughes to represent him in connection with a criminal matter and paid her $2,500.00 to do so. Mr. Jones and a co-defendant, Ivan Williams, had been *779 charged with theft over $500.00 from the Fischer Residence Council. Both men were officers of the Council whose signatures were required on Council checks. Mr. Williams was represented by Attorney Demetrie Ford.
Prior to the bill of information being filed, Attorney Hughes requested the issuance of two subpoenas and appeared in magistrate court to secure a continuance of a motion seeking a handwriting sample from Mr. Jones. Thereafter, she failed to file any further pleadings or make any further appearances. Most notably, she failed to appear at Mr. Jones' arraignment, and she failed to appear in court when he pleaded guilty to a reduced charge of attempted theft. Demetrie Ford, co-defendant's counsel, represented Mr. Jones at the guilty plea. Mr. Jones expressly noted his dissatisfaction with this arrangement in his Boykin colloquy, explaining to the judge that he "was not satisfied [with Attorney Hughes], your Honor, because, ah, the lady never showed up with me at the time of court." Mr. Jones testified that he did not want Mr. Ford to represent him because he considered it to be a conflict of interest, but felt that, given his past criminal record, he had no choice but to accept the representation and the plea.
For her part, Attorney Hughes testified that she conceived the idea for a plea bargain and took part in the negotiations that resulted in the plea. She admitted not being present in court when Mr. Jones entered his guilty plea, but insisted that she had arranged for Mr. Ford to be there in her absence and that she had informed Mr. Jones of this arrangement. Mr. Jones denied any such knowledge. Mr. Ford testified that he had no contract with, nor was he paid by, Mr. Jones and that, although he believed he was standing in for Attorney Hughes, his loyalty was to his client, Mr. Jones' co-defendant. The assistant district attorneys who prosecuted the case, as well as the HANO representative bringing the charges, testified that they had no recollection of any involvement by Attorney Hughes in the plea negotiations. The district attorney's internal records, which contain contemporaneous memoranda documenting the plea arrangement, reveal no involvement by Attorney Hughes.
Following its consideration of the evidence and testimony, the Commission concluded that it was proved by clear and convincing evidence that Attorney Hughes violated the Rules of Professional Conduct applicable to lawyersspecifically, Rule 1.3 (failure to act with reasonable diligence and promptness in representing a client), Rule 1.4(a) (failure to communicate with a client), and Rule 1.5(f)(6) (failure to return an unearned fee)as well as La. Const. art. V, § 25(C). The Commission did not find violations of the Code of Judicial Conduct.
We agree with the Commission's finding. The record clearly and convincingly demonstrates Attorney Hughes' failure to uphold the Rules of Professional Conduct. As Mr. Jones himself explained when outlining his complaint against Attorney Hughes: "It wasn't a money thing. It was just having a mouth piece." The record reveals that Attorney Hughes completely and utterly failed to provide representation, forcing Mr. Jones to accept representation from his co-defendant's counsel representation that he viewed as a conflict of interest. Attorney Hughes' conduct also violates La. Const. art. V, § 25(C) because her refusal to account to her client or to return unearned fees continued after she assumed judicial office, thereby constituting persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute.
*780 Charge 0169: The Troy Dews matter.
In this charge, the Commission alleged that Troy Dews paid Attorney Hughes $2,500.00 to represent his nephew in a criminal matter. She did no work in the case, forcing Mr. Dews to retain and pay new counsel. When Mr. Dews demanded a refund, she sent a partial refund by check drawn on her client trust account that was returned twice for insufficient funds. After nine months, the refund remained unpaid. These actions, the Commission charged, violate Rules 1.4(a), 1.5(f)(6), 1.16(d), 8.4(c), 8.1(c), and 8.4(g) of the Rules of Professional Conduct, Canons 1 and 2 A of the Code of Judicial Conduct, and La. Const. art. V, § 25(C) in that the actions were persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute.
The evidence adduced at the hearing reveals that Mr. Dews paid Yvonne Hughes $2,500.00 to represent his nephew in connection with conspiracy to distribute cocaine base, a charge pending in federal district court in Mississippi. In a letter outlining the terms of her representation, Attorney Hughes agreed that upon receipt of an initial retainer, she would conduct an investigation into the charges and visit the defendant, who was being held in jail in Jackson, Mississippi. She would then contact family members, and the balance of her $10,000.00 fee would become due if they desired her to continue.
Attorney Hughes maintained that she investigated the case by talking to family members and that she went to Jackson, Mississippi, to visit the defendant, but did not end up going to the jail. She did not enroll as counsel, nor did she make any appearances on behalf of Mr. Dews' nephew. Despite receiving timely notice, she did not appear at the arraignment, nor did she request a continuance of same from the magistrate, although she claimed to have asked the prosecuting assistant district attorney for a continuance, as evidenced by a letter to the district attorney mailed the day after the arraignment.
Mr. Dews testified that it became quickly apparent that Attorney Hughes was not going to appear on behalf of his nephew. As a result, he was forced to retain and pay new counsel. Thereafter, Mr. Dews demanded that she refund his retainer. Attorney Hughes admitted that Mr. Dews requested a refund, but denied that she agreed to return his full $2,500.00 retainer, claiming that she had earned a portion of the fee and incurred expenses by making a trip to Jackson, Mississippi, on behalf of Mr. Dews' nephew. Ultimately, however, she admitted that she traveled to Jackson to attend a gospel concert and to visit a sick friend and that she did not visit Mr. Dews' nephew while she was there.
Attorney Hughes further admitted that she issued a refund check, for a partial refund, to Mr. Dews on her trust account. After spending approximately six weeks unsuccessfully attempting to obtain a full refund, Mr. Dews testified that he attempted to deposit the check for the partial refund, but it bounced. When he redeposited the check, it bounced again.
At the hearing before the Commission, Attorney Hughes conceded that she failed to provide Mr. Dews with an accounting and that she probably owes Mr. Dews some money. However, she stated that she has not repaid any of the monies she received because the Judiciary Commission has no arbitration or fee dispute resolution vehicle and because paying the money back would not necessarily stop the disciplinary process.
She further conceded that she failed to comply with a Commission subpoena for *781 her trust account records, testifying that she did not think it necessary to reply because the Commission could just subpoena those records directly from the bank. She explained that she failed to produce other documents requested by the Commission because a 1996 fire had destroyed many of her files. However, she was not retained by Mr. Dews until 1998.
Following its consideration of the evidence and testimony, the Commission concluded that it was proved by clear and convincing evidence that Yvonne Hughes violated the Rules of Professional Conduct applicable to lawyersspecifically, Rule 1.4(a) (failure to communicate with a client), Rule 1.5(f)(6) (failure to refund an unearned fee), Rule 1.16(d) (termination of representation), Rule 8.1(c) (failure to cooperate with the Office of Disciplinary Counsel in its investigation), and Rule 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation). The Commission also concluded that she violated Canons 1 (upholding the integrity and independence of the judiciary) and 2 A (complying with the law and acting in a manner that promotes public confidence in the judiciary) of the Code of Judicial Conduct, as well as La. Const. art. V, § 25(C).
We agree with this conclusion and find that the evidence offered in connection with this charge fully supports the Commissions' findings. Judge Hughes admitted that she "probably" owes Mr. Dews monies and that she failed to provide him with an accounting. Nevertheless, the evidence clearly and convincingly demonstrates that she has not repaid one penny of the monies she admits she owes. Her excuse for this conductthat reimbursement would not necessarily stop the disciplinary proceedingswe find especially disturbing. For Judge Hughes to continue through three years as an elected judge with monies admittedly owed, but unpaid, brings Louisiana attorneys and its judiciary into disrepute.
Charge 0173: The Koch matter.
In this charge, the Commission alleged that despite repeated requests, Attorney Hughes failed to surrender client files to the attorney who had been retained to represent her former client in civil litigation that she had instituted on that client's behalf. Such conduct, the Commission charged, violates Rules 1.16(d), 8.1(c), and 8.4(g) of the Rules of Professional Conduct, as well as Canons 1 and 2 A of the Code of Judicial Conduct and La. Const. art. V, § 25(C) in that the actions were persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute.
The evidence adduced at the hearing reveals that Attorney Joshua Koch was retained to represent Hilda Monroe in civil litigation pending in the Civil District Court for the Parish of Orleans. Ms. Monroe retained Mr. Koch because Yvonne Hughes, her previous attorney who was counsel of record in the case, refused to return her calls. Mr. Koch testified that upon assuming Ms. Monroe's representation, he made numerous attempts to obtain Ms. Monroe's file from Yvonne Hughes. That file was important because there was evidence critical to the case that was missing and Mr. Koch hoped that the missing evidence might be found in the files.
According to Mr. Koch, he was "ignored from the get-go by Ms. Hughes." After reporting her failure to cooperate to the Office of Disciplinary Counsel, Mr. Koch was ultimately forced to issue a notice of records deposition and subpoena for Yvonne Hughes to appear in the courtroom of Judge Carolyn Gill Jefferson (the *782 presiding judge in the case).[18] Despite personal service, Judge Hughes failed to appear. A proces verbal was taken, reflecting her absence. Judge Gill Jefferson placed a call to Judge Hughes' office (which Judge Hughes did not take) explaining that all that was needed was a copy of the file. In response, Judge Hughes submitted an affidavit swearing that she had no file. Mr. Koch testified that he considered it "incomprehensible" that she would not have a single file, especially since there were three separate lawsuits filed, the client had reported turning over original documents to Ms. Hughes, and the incident giving rise to the litigation had received attention in the media.
Following its consideration of the evidence and testimony, the Commission concluded that it was proved by clear and convincing evidence that Judge Hughes violated the Rules of Professional Conduct applicable to lawyersspecifically Rule 1.16(d) (termination of representation) and Rules 8.1(c) and 8.4(g) (failure to cooperate with the Office of Disciplinary Counsel in its investigation)as well as Canons 1 and 2 A of the Code of Judicial Conduct and La. Const. art. V, § 25(C).
We agree with this conclusion. We find, as did the Commission, that Judge Hughes' failure to cooperate with Mr. Koch was proved by clear and convincing evidence, and that her failure to maintain a file of original documents provided to her by her client was particularly harmful in this instance, placing the success of the civil case in jeopardy. We also find clear and convincing evidence of willful misconduct that brings the judicial office into disrepute in Judge Hughes' admission that (while serving as a judge on the juvenile court, issuing orders commanding persons to appear before her court, and issuing bench warrants for those refusing to honor her requests) she ignored a subpoena to appear in Judge Carolyn Gill-Jefferson's court. In that respect, we find the fact she ignored a subpoena especially egregious, absolutely unacceptable, and totally intolerable.
Charge 0174: The Perez-Ferguson matter.
In this charge, the Commission alleged that Yvonne Hughes, who had been elected judge and would assume office in 21 days, was retained by Matthew Perez to represent his stepson in a criminal matter and accepted $700.00 toward a $1,500.00 fee. She appeared in court on behalf of Mr. Perez's stepson on December 21, 2000, but made no further appearances and abandoned her representation when she took office. Thereafter, she failed to refund the unearned portion of her fee. Such conduct, the Commission charged, violates Rules 1.3, 1.4(a), 1.5(f)(6), 1.16(d), 8.4(c), and 8.4(d) of the Rules of Professional Conduct, Canons 1 and 2 A of the Code of Judicial Conduct and La. Const. art. V, § 25(C) in that her actions were persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute.
The evidence adduced at the hearing on this charge reveals that on December 13, 2000, the same day that Yvonne Hughes signed the oath of office for her position on the juvenile court, she was retained by Matthew Perez to represent his stepson, Dorian Ferguson, in a criminal matter in Jefferson Parish. Mr. Perez, a resident of Buffalo, New York, forwarded $500.00 to Judge Hughes by overnight courier as an initial retainer. Mr. Ferguson's girlfriend (later wife) paid Judge Hughes an additional $200.00 toward a total fee of $1,500.00.
*783 On December 21, 2000, Judge Hughes appeared in court as counsel of record for Mr. Ferguson. The court set a motion hearing for January 18, 2001, and trial for January 22, 2001. Following this appearance, Ms. Hughes performed no other legal services on behalf of Mr. Ferguson. She abandoned her representation when she assumed office on January 3, 2001.
Mr. Ferguson's wife testified that Yvonne Hughes informed her on December 21 that she had been elected judge, but Mrs. Ferguson did not understand that Judge Hughes could not continue as Mr. Ferguson's counsel. Mr. Ferguson testified that Ms. Hughes told him she would arrange a plea bargain for him on the very next court date, so he was surprised when she was not present in court on January 18 for the scheduled motions hearing. He testified that when she failed to appear in court, he contacted her by phone and she told him that she had referred the matter to another law firm, along with the balance of the retainer. Mrs. Ferguson testified that Judge Hughes also told her that another firm had agreed to take over the representation, that the monies they had previously paid would be "credited" by the other law firm, and that the total fee would remain at $1,500.00. Mrs. Ferguson further testified that when she contacted the other firm, the firm demanded $3,500.00 to be paid in a lump sum. The firm denied receiving any funds from Judge Hughes, and ultimately declined to represent Mr. Ferguson.
Judge Hughes acknowledged that she did not refund any portion of the $700.00 fee she received in this matter, insisting that she had earned that fee when she appeared in court on December 21 and spoke with the assistant district attorney about a possible plea. She testified that she felt comfortable in accepting the case so close to the date she was scheduled to assume the bench because she "had bills to pay," and believed the Spears law firm would take over the case, assuring competent representation. She stated that she explained to the Fergusons that the fee would remain at $1,500.00 only if a plea agreement was arranged.
Following its consideration of the evidence and testimony, the Commission concluded that it was proved by clear and convincing evidence that Judge Hughes violated the Rules of Professional Conduct applicable to lawyersspecifically, Rule 1.3 (failure to act with reasonable diligence and promptness in representing a client), Rule 1.4(a) (failure to communicate with a client), Rule 1.5(f)(6) (failure to refund an unearned fee), Rule 1.16(d) (termination of representation), Rule 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), and Rule 8.4(d) (engaging in conduct prejudicial to the administration of justice)as well as Canons 1 and 2 A of the Code of Judicial Conduct and La. Const. art. V, § 25(C). The Commission also concluded that Judge Hughes failed to cooperate with the Commission's investigation of the complaint, in violation of JCL Rule VII(D).
Our review of the record in this instance convinces us that the charges against Judge Hughes were proved by clear and convincing evidence and that the Commission's conclusions in this matter are fully supported by the record. Yvonne Hughes accepted representation that she knew she could not complete without explaining to her client the ramifications of her election to the bench, made a single court appearance on her client's behalf, and then abandoned her client completely, leaving him to fend for himself,[19] while *784 refusing to refund any portion of the $700.00 fee she collected. Such conduct is unconscionable and brings Louisiana attorneys and the judiciary into disrepute.
Charge 0175: The Turner matter.
In this charge, the Commission alleged that thirteen days prior to the date she assumed office, Ms. Hughes was retained by Lana Turner to represent her son in connection with a charge of second degree murder. Failing to advise Ms. Turner that she had been elected to judicial office, Ms. Hughes accepted a $1,500.00 retainer, $500.00 of which she paid to an investigator. Thereafter, upon assuming office, she abandoned her representation of Mr. Turner, failed to advise Mr. Turner of this fact, failed to advise Ms. or Mr. Turner that she had secured other counsel to represent him, failed to secure consent for the substitute representation, and failed to return any portion of the unearned fee. Such conduct, the Commission charged, violates Rules 1.3, 1.4(a), 1.5(f)(6), 1.16(d), 8.4(c), and 8.4(d) of the Rules of Professional Conduct, Canons 1 and 2 A of the Code of Judicial Conduct, and La. Const. art. V, § 25(C) in that the actions were persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute.
The evidence adduced at the hearing reveals that on December 21, 2000, thirteen days before she was to assume judicial office, Lana Turner retained Yvonne Hughes to represent her son, Darnell, in connection with a charge of second degree murder. Failing to advise Ms. Turner that she had been elected to the bench, Ms. Hughes agreed to represent Mr. Turner upon receipt of a $1,500.00 retainer. Yvonne Hughes went to Ms. Turner's home herself to pick up the fee. She instructed Ms. Turner to come to her office to sign a retainer agreement, but despite repeated attempts to do so, Ms. Turner was unable to reach Ms. Hughes. She finally reached Yvonne Hughes on December 28, 2000, on her cell phone. Ms. Hughes advised Ms. Turner that she was traveling back to New Orleans from Connecticut and that she would call Ms. Turner upon her return to New Orleans. She failed to do so. Ms. Hughes did secure the services of a private investigator on behalf of Mr. Turner and paid him $500.00 from the funds she had received from Ms. Turner. No other services were rendered on behalf of Mr. Turner.
When Judge Hughes assumed the bench on January 3, 2001, she abandoned her representation of Mr. Turner. However, she did not advise the Turners that she had been elected judge, or that she would no longer continue to represent Mr. Turner, or that she had arranged for Attorney Demetrie Ford to take over the representation. She did not secure the permission of either Mr. or Ms. Turner for Mr. Ford to take over the case.
When Ms. Turner discovered that Judge Hughes had assumed judicial office and would no longer represent her son, she demanded a refund. She testified that she would never have retained Judge Hughes had she known that she would be unable to represent her son.
Judge Hughes failed to refund any portion of the fees she received from Ms. Turner. According to Judge Hughes, she agreed to accept the representation knowing she had only 13 days before assuming office because she felt it would be advantageous to Mr. Turner to get an investigation *785 started quickly. She testified that at the time she referred the Turner case to Mr. Ford, she had performed all the work that she had agreed to do, and that she did not owe Ms. Turner a refund of any portion of her fee.
In response to a subpoena for records pertaining to the Turner case, Judge Hughes claimed that a fire had destroyed her records, notwithstanding the fact that the fire allegedly occurred in 1996, some four years before Ms. Turner retained Judge Hughes to represent her son.
Following its review of the evidence and testimony, the Commission concluded that it was proved by clear and convincing evidence that Judge Hughes violated the Rules of Professional Conduct applicable to lawyers, as well as the Code of Judicial Conduct and the Louisiana Constitution. Specifically, the Commission determined that Judge Hughes violated Rules 1.3 (failure to act with reasonable diligence and promptness in representing a client), 1.4(a) (failure to communicate with a client), 1.5(f)(6) (failure to refund an unearned fee), 1.16(d) (termination of representation), 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), and 8.4(d) (engaging in conduct prejudicial to the administration of justice) of the Rules of Professional Conduct. The Commission also determined that Judge Hughes violated Canons 1 and 2 A of the Code of Judicial Conduct and La. Const. art. V, § 25(C). Finally the Commission determined that Judge Hughes failed to cooperate with the Commission's investigation of this charge, in violation of JCL Rule VII(D).
We find that the Commission's charges in this matter were proved by clear and convincing evidence. We also find that while Judge Hughes' conduct in this instance provides one of the more egregious examples of lawyer misconduct, it is nevertheless illustrative of the pattern of neglect that was established. The evidence clearly and convincingly establishes that as an attorney, Judge Hughes time and time again took money from people who could ill afford to pay it, did minimal or no work to earn it, and then refused to refund monies she clearly had not earned. Preying upon her clients' lack of education and lack of sophistication in legal matters, Judge Hughes either ignored or cavalierly dismissed complaints that she had failed to perform the services for which she was retained, explaining that her work was all done behind the scenes and that her fees were all earned. However, she failed to produce any records that might substantiate her claims and failed to account to her clients for their hard-earned dollars.
Such conduct is inexcusable. Judge Hughes' documented failure to account to her clients, to return unearned fees even after acknowledging that refunds were owed, to appreciate the significance of holding herself out as a notary when she holds no notary commission, and to abide by the basic rules of law that govern all citizens, not just lawyers and judges (such as campaign finance laws and valid subpoenas) is persistent and public conduct prejudicial to the administration of justice that warrants discipline. We find the Lawyer Charges were proved by clear and convincing evidence and establish a pattern of misconduct relevant to our determination of the ultimate sanction to be imposed.
Failure to cooperate.
Before proceeding to the issue of sanctions, there is one final matter we must address. In its findings of fact and conclusions of fact and law, the Commission expressed disappointment and frustration with Judge Hughes' conduct during the course of the Commission proceedings. The Commission charged that Judge *786 Hughes refused to cooperate with its discovery requests, and the record in this matter fully supports that allegation. Judge Hughes repeatedly failed to respond to subpoenas ordering her to produce her case files, necessitating the issuance of orders compelling her compliance. In response to these orders, Judge Hughes produced few or no case files, claiming that her files were destroyed in a fire, even though in many instances the alleged fire occurred well before she even received the cases. The Commission, noting the spuriousness of this excuse, finally concluded:
There was much testimony in the record about the purported fire in or behind a shed attached to [Judge Hughes'] law office on Broad Street in New Orleans and the various dates that fire might have occurred. Giving Judge Hughes the benefit of the doubt that a fire occurred as late as the end of 1988, there remained numerous complaints based on facts that occurred in 1999 and later to which Judge Hughes told the disciplinary investigators she could not produce records due to a fire. The Commission concludes that Judge Hughes lied about the fire having destroyed records in all those cases that she undertook after 1999. [Emphasis added.]
Judge Hughes' lack of cooperation with the Commission, the Office of Disciplinary Counsel, and the Office of Special Counsel extended beyond her allegations with respect to the infamous fire. She claimed that she was prevented from responding to subpoenas and lawful orders for a variety of reasons, including inability to get to the post office before closing hours, lack of transportation to the post office, and adverse weather conditions (i.e., a flood). She complained that the discovery requests were burdensome and responding would have taken too much time away from her judicial duties. Nevertheless, she failed to formally move to quash any subpoena issued. She simply opted not to respond.
Judge Hughes' documented non-compliance eventually resulted in a Commission order prohibiting her from introducing any exhibits or witness testimony (other than her own) at the Commission hearing. Judge Hughes complains that this order prevented her from presenting a defense, causing substantial prejudice that requires this court to dismiss the Commission proceedings, or, in the alternative, to remand this matter to the Commission for receipt of additional evidence.[20] We reject this contention.
While the Commission's action in this instance appears to be extreme, we have previously recognized the Commission's power and authority to enforce its orders. See, In re Sharp 03-2256, p. 3 (La.10/29/03), 856 So.2d 1213, 1215 (failure of respondent judge to answer formal charges or respond to discovery propounded by Office of Special Counsel resulted in Commission order deeming the allegations of the formal charge admitted and limiting presentation to be made by judge at the hearing on the merits). Given the factual circumstances that prompted the Commission order in this case, we do not find that order to be arbitrary, unreasonable, or unjustified.
The record reveals that, prior to issuing the order excluding Judge Hughes' witnesses *787 and exhibits, the Commission issued orders to Judge Hughes on at least five separate occasions commanding her to comply with subpoenas and/or discovery requests. In the last order, dated September 23, 2002, the Commission directed Judge Hughes to file her discovery responses by October 3, 2002, or be precluded from introducing any witness testimony or exhibits at the scheduled hearing. Nevertheless, Judge Hughes failed to comply with the Commission order, filing her witness list and exhibit list on October 8, 2002.[21] Even that untimely filing failed to comply with the Commission order, as no exhibits were attached and the answers supplied were general as opposed to specific.
Notably, in issuing the order precluding Judge Hughes from presenting exhibits and witness testimony other than her own at the hearing, the Commission reserved to Judge Hughes the right to proffer testimony to this court should the Commission make a recommendation of discipline. No such proffer was attempted. Moreover, La. Sup.Ct. Rule XXIII, § 13 expressly confers upon Judge Hughes the right to petition this court to receive additional evidence, providing, in pertinent part, that "[a]pplication for permission to file additional evidence may be filed by either party within ten days after the filing of the recommendations, transcript, findings, and conclusions with the clerk of the supreme court." The record in this case was filed in this court on December 12, 2003, giving Judge Hughes until December 22, 2003, in which to apply to this court for the reopening of the proceedings to take additional testimony. No timely application was submitted by Judge Hughes. Her complaints with respect to the Commission order and the exclusion of witnesses and exhibits simply come too late.

IMPOSITION OF DISCIPLINE
Having determined that Judge Hughes violated Canons 1, 2 A, 2 B, 3 A(1), 3 A(3), 3 A(4), 3 A(7), 3 B(1), and 7 B(1)(a) of the Code of Judicial Conduct, as well as the constitutional standard articulated in La. Const. art. V, § 25(C), we must now determine the proper discipline to be imposed. The Commission argues that Judge Hughes' conduct, on multiple levels (as attorney, candidate, and then judge), warrants her removal from office. We agree that Judge Hughes must be removed from office.
In imposing this most severe sanction, we are mindful of the serious considerations our task invokes.
Removal of a judge from duly-elected office is undoubtedly the most severe sanction this court may impose under the authority granted to us by the constitution. Not only is the judge removed from his or her present judicial office, but removal also precludes the former judge from becoming a candidate for judicial office for a minimum of five years and until his or her eligibility to seek judicial office is certified by this court. See La. Sup.Ct. Rule XXIII, § 26. Consequently, we recognize that removal of a duly-elected member of the judiciary is "an extremely serious undertaking that should be carried out with the utmost care because it disrupts the public's choice for service in the judiciary."
On the other hand, the constitution "vests in this court the duty to preserve the integrity of the bench for the benefit of the public `by ensuring that all who *788 don the [judicial] robe and serve as ministers of justice do not engage in public conduct which brings the judicial office into disrepute.'" To that end, we have recognized that the primary purpose of the Code of Judicial Conduct is "to protect the public rather than to discipline judges." Likewise, the objective of a judicial disciplinary proceeding "is not simply to punish an individual judge but to purge the judiciary of any taint." [Citations omitted.]
In re Hunter, 02-1975, p. 11-12 (La.8/19/02), 823 So.2d 325, 333.
As we noted in In re King, 03-1412 (La.10/21/03), 857 So.2d 432, since 1887, we have removed only eight judges from office (now nine including King). Thus, removal of a judge is a task we pursue cautiously, and only after painstaking evaluation and careful contemplation, remembering that the electorate can only be served by those who are faithful to the solemn oath of office, the constitution, and the Canons of the Code of Judicial Conduct. The judiciary of this state is not defined by the inappropriate acts of an infinitesimal few. The strength of our judiciary lies in the vast, overwhelming number of judges who diligently discharge the duties of the office. The strength of our judicial system lies in its intolerance of those who are unfaithful to the oath administered to all judges, unfaithful to the constitution, and unfaithful to the Code of Judicial Conduct which governs judicial behavior. While removal of a judge elected to office by the citizenry is a grave responsibility, and one we would prefer never to have to exercise, that preference must yield when conduct demonstrates, clearly and convincingly, that there has been a complete failure to discharge and perform the duties incumbent on one holding judicial office. Given the magnitude of the violations and probability of the recurrence of the violations, removal is appropriate. In re Hunter, 02-1975 at 16 (La.8/19/02), 823 So.2d at 336.
In King, this court observed that in cases in which removal from office is the recommended sanction, the guidelines noted in In re Whitaker, 463 So.2d 1291 (La. 1985) direct our deliberations. The Whitaker court stated:
The most severe discipline should be reserved for judges who use their office improperly for personal gain; judges who are consistently abusive and insensitive to parties, witnesses, jurors and attorneys; judges who because of laziness or indifference fail to perform their judicial duties to the best of their ability; and judges who engage in felonious criminal conduct.
Whitaker, 463 So.2d at 1303.
We further explained in King:
In addition, the four types of conduct recognized in Whitaker as warranting removal "were not intended as an exclusive list of the types of conduct for which a judge can be removed from office." In Huckaby, we explained that "both La. Const. art. V, § 25 and the Code of Judicial Conduct contemplate, and allow, removal for a broader range of offenses than the illustrative list set forth in Whitaker" Indeed, especially relevant to this case, La. Const. art. V, § 25 authorizes removal from office for, among other things, "willful misconduct relating to [the judge's] official duty," "persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute," and "conduct while in office which would constitute a felony." [Citations omitted.]
King, 03-1412, at 20, 857 So.2d at 446.
Taking these factors into consideration, we are drawn to but one conclusion. While Judge Hughes might not have used *789 her office for pecuniary gain, she was, by her flagrant and persistent failure to observe regular and predictable court hours, abusive and insensitive to the persons who came before her and to the juvenile court as a whole. Further, by her demonstrated inability to prepare judgments in a timely manner, by her questionable practice of conducting court by phone and/or allowing staff to run the docket in her absence, and by her failure to ensure that an accurate record was made of all proceedings in her section of court, Judge Hughes proved to be either unwilling or simply inept at performing her administrative judicial duties at a level that is acceptable to assure the proper handling of juvenile defendants in Orleans Parish Juvenile Court. As a result, Judge Hughes clearly and convincingly engaged in willful misconduct relating to her judicial duties. Further, by employing staff persons who were either convicted felons or who lacked qualifications for the jobs in question, Judge Hughes engaged in conduct prejudicial to the administration of justice that brought the judiciary into disrepute. Such conduct cannot be tolerated. Such behavior is disrespectful to the electorate that chose her for this solemn office and is disrespectful to the office itself.
We note that Judge Hughes' conduct with respect to her proven administrative failures is similar to that of former Judge Sharon Hunter in her removal case, In re Hunter, supra. As did former Judge Hunter, Judge Hughes exhibited a pattern of "woefully inadequate" administrative ability which, when viewed in light of her proven administrative failures as a lawyer, creates an unacceptable risk to the public should she remain on the bench. Judge Hughes' administrative shortcomings include, among others, her practice of starting and ending court outside of regular court hours, casting the administration of the entire juvenile court into disarray; conducting "court by phone;" failing to ensure that her "court of record" actually made a record when court reporters were not present for scheduled hearings; and refusing to cooperate with the other judges on her court. These administrative failures are exacerbated by her conduct not only in associating with convicted felons, but in integrating those felons into the very operation of her section of court, and in doing so, violatingindeed, ignoringthe confidentiality that is essential to and an integral part of juvenile proceedings. Adding to the administrative failures evident in Judge Hughes' court is her practice of bestowing bond releases on individuals with no connection to juvenile proceedings at the expense of completing clearly defined judicial duties and responsibilities. Taken together with her proven pattern of misconduct as a lawyer, including her practice of taking retainers from clients, not communicating with those clients, not accounting to those clients or maintaining records that would allow her to do so, not earning the fees deposited and not returning the unearned portion of those deposited fees, the evidence overwhelmingly establishes Judge Hughes' extensive history of administrative incompetence. Given that history, we can have no confidence in her assertion that, if allowed to remain on the bench, she can become a competent administrator. The evidence that Judge Hughes failed to operate within the court structure is overwhelming and profound. Her documented lack of cooperation and inability to abide by the rule of law is inconsistent with her remaining on the bench.
To sit in judgment is an awesome responsibility and a solemn duty. Daily, judges are called upon to render decisions that would defy the wisdom of Solomon. The role of the judiciary is to provide a forum for the resolution of disputes that is fair, just, impartial, and based on the law *790 and evidence. Such a role cannot be realized if a judge refuses to abide by the law.
The record in this case is replete with evidence of Judge Hughes' complete and utter failure to respect and abide by the rule of law when it is not in her interest to do so. As a lawyer, she flagrantly ignored the Rules of Professional Conduct, in particular those that govern fee disputes. As a candidate, she repeatedly ignored the law requiring the timely submission of campaign finance disclosure reports, a fact that received extensive coverage in the media, tarnishing the image of the judiciary in the process. Finally, as a judge she ignored the lawful orders of the Commission in its investigatory process, hypocritically ignored a subpoena to appear in the court of a fellow member of the judiciary, and violated the reporting requirements imposed by this court. Reverberating throughout the record are examples that Yvonne Hughes disdains the rule of law.
Obedience to judicial decrees is critical to the proper functioning of our legal system. Essential to the system is the respect citizens have for the judges they have entrusted to issue decrees that impact their lives, their liberties, and their property. When a judge demonstrates a lack of respect for the rule of law, that sacred trust is violated and our entire system of justice is placed at risk. To command respect for the rule of law, a judge must demonstrate respect for the rule of law. Judge Hughes has demonstrated a blatant and incorrigible inability to conform to the rules imposed on any aspect of her careerbe it notary, attorney, candidate, or judge.
In this case, while each individual charge against Judge Hughes standing alone (such as the abuse of parole power charge) might not warrant the extreme disciplinary measure of removal, the record, when viewed in its entirety, shows a persistent pattern of conduct that does not comport with the standards required by the Code of Judicial Conduct and the Louisiana Constitution. The statements we made in In re Haggerty, 257 La. 1, 40, 241 So.2d 469, 482 (1970), are equally applicable here:
In summary, perhaps none of the improprieties noted might be ground for removal by itself. Each perhaps might be subject to minimizing explanation as an isolated instance. In cumulation, however, they amount to a substantial pattern of willful misconduct related to official duty which casts a grave doubt upon the respondent judge's ability to perform his duties impartially and in accordance with law.
After exhaustively reviewing the record, we find the "explanations" offered by Judge Hughes to excuse her misconduct preposterous or false. For the foregoing reasons, we can reach no other conclusion than that the most severe discipline is warranted.

CONCLUSION
Because Judge Hughes has repeatedly engaged in willful misconduct relating to her official duties and persistent and public conduct prejudicial to the administration of justice that has brought her judicial office into disrepute, and based on the probability of the recurrence of the violations, removal from office is the only appropriate sanction in this case. Because of the seriousness and pervasiveness of the lawyer misconduct with which Judge Hughes has been charged, we reserve to the Lawyer Disciplinary Board the right to institute lawyer discipline proceedings against Judge Hughes as well.

DECREE
Accordingly, it is ordered, adjudged, and decreed that respondent, Judge Yvonne L. Hughes, of the Orleans Parish Juvenile Court, Division "C," State of Louisiana, be, and is hereby, removed from office; and *791 that her office be, and is hereby declared vacant. Respondent is ordered pursuant to La. Sup.Ct. Rule XXIII, § 26 to refrain from qualifying as a candidate for judicial office for five years and until certified by this court as eligible to become a candidate for judicial office. Further, exercising the discretion allowed this court by La. Sup. Ct. Rule XXIII, § 22, we cast the respondent with costs incurred in the investigation and prosecution of this proceeding in the amount of $20,293.12. Finally, the right of the Lawyer Disciplinary Board of the Louisiana State Bar Association to bring lawyer disciplinary proceedings against respondent under the authority of La. Const. art. V, § 25(D) is expressly reserved.
REMOVAL FROM JUDICIAL OFFICE ORDERED; RIGHT TO BRING LAWYER DISCIPLINARY PROCEEDINGS RESERVED.
JOHNSON, J., concurs in part, dissents in part and will assign reasons.
NOTES
[1] The Judiciary Commission is a constitutional commission composed of three judges, three attorneys and three citizens who are not attorneys or public officials, empowered to review allegations of judicial misconduct and to recommend to this court that a judge be sanctioned when misconduct is proved by clear and convincing evidence. La. Const. art. V, § 25 (1974). The Judiciary Commission serves as a constitutionally established check and balance on the authority of this court to discipline judges in that this court can take action only on recommendation by the Judiciary Commission. La. Const. art. V, § 25(C).
[2] While Judge Hughes was not yet an elected judge at the time of the alleged wrongful campaign conduct, she was nonetheless bound by Canon 7 of the Code of Judicial Conduct insofar as her campaigns were concerned. See Canon 7(G) ("Canon 7 generally applies to all incumbent judges and judicial candidates. A successful candidate, whether or not an incumbent, is subject to judicial discipline for his or her campaign conduct; an unsuccessful candidate who is a lawyer is subject to lawyer discipline for his or her campaign conduct. A lawyer who is a candidate for judicial office is subject to Rule 8.2(a) and (b) of the Louisiana Rules of Professional Conduct.").
[3] Specifically, proceedings were conducted on January 17, January 18, February 21, March 14, March 15, May 8, May 9, May 10, June 19, July 17, July 18, and July 19, 2003.
[4] Canon 1 provides, in pertinent part: "A judge should participate in establishing, maintaining, and enforcing, and shall personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved." Canon 2 A states: "A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Canon 2 B provides, in pertinent part: "A judge shall not allow family, social, political, or other relationships to influence judicial conduct or judgment. A judge shall not lend the prestige of judicial office to advance the private interest of the judge or others; nor shall a judge convey or permit others to convey the impression that they are in a special position to influence the judge." Canon 3 A(1) provides, in pertinent part: "A judge shall be faithful to the law and maintain professional competence in it." Canon 3 A(3) states: "A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity, and should require similar conduct of lawyers, and of staff, court officials, and others subject to the judge's direction and control." Canon 3 A(4) states: "A judge shall perform judicial duties without bias or prejudice. A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, and shall not permit staff, court officials or others subject to the judge's direction and control to do so." Canon 3 A(7) provides: "A judge shall dispose of all judicial matters promptly, efficiently and fairly." Canon 3 B(1) states: "A judge shall diligently discharge the judge's administrative responsibilities without bias or prejudice and maintain professional competence in judicial administration, and should cooperate with other judges and court officials in the administration of court business." Finally, Canon 7 B(1)(a) provides, in pertinent part, that a judge or judicial candidate "shall maintain the dignity appropriate to judicial office and act in a manner consistent with the integrity and independence of the judiciary."
[5] In Orleans Parish alone, Mr. Barley had five prior convictions for theft, one for simple burglary, and five prior convictions for issuing worthless checks. In connection with two of the instances in which he faced charges of issuing worthless checks and ultimately pled guilty, he was represented by Attorney Yvonne Hughes.
[6] In mitigation, we note, as did the Commission, that Major William Hunter of the Orleans Criminal Sheriff's Office testified that his office took the position that LSA R.S. 15:574.15(A)(2)'s exception for "any elected officer" did not apply to judges and therefore freely acceded to the parole requests.
[7] Canon 1, quoted in footnote 4, supra, is directed toward the maintenance of an independent and honorable judiciary, while Canon 2 A provides that "[a] judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."
[8] While Judge Hughes insisted that, more likely than not, the computers used by Mr. Smith and Ms. Martin to type judgments were her own personal computers and not court computers, the evidence to the contrary was overwhelming. Moreover, even if court computers were not involved, the fact remains that the information provided to Mr. Smith and Ms. Martin to type the judgments was confidential.
[9] In her answer to the formal charges, Judge Hughes challenged the legality of the seizure of the court records, alleging that the instanter subpoena was "defectively served on her administrative assistant Ardell Freeman and that various documents were illegally seized in violation of the United States and Louisiana constitutions and state and federal law." In her brief to this court, Judge Hughes does not re-urge this challenge, and we find, as did the Commission, that it has no merit. The Commission has authority to issue subpoenas and to require the production of books, records, documents, or other evidence deemed relevant or material to an investigation or hearing. LSA R.S. 13:36; La. Sup.Ct. R. XXIII § 5(a). Moreover, in this instance, the seizure of the court records was constitutional, as no privacy expectations attached to the records. They were public records (although subject to confidentiality pursuant to LSA Ch.C. art. 412), in plain view, and housed in a place of public accommodation (the judge's outer offices). The evidence is clear that neither the judge's desk nor her private chambers were searched. Finally, we conclude, as did the Commission, that even if the seizure was invalid, there was ample credible testimony in the record, without reference to the specific case files seized, establishing by clear and convincing proof that Judge Hughes failed to issue a large number of judgments in a timely manner.
[10] Judge Ernestine Gray, a senior judge in the Orleans Parish Juvenile Court, testified that using available computer templates, she was able to get her judgments out "in a matter of days."
[11] The evidence further established that Judge Hughes' dilatoriness in preparing judgments could have adverse consequences for the State of Louisiana, which could lose federal funds for the foster care system should the federal government's audit reveal irregularities in the state's compliance with the requirements of the Adoption and Safe Families Act.
[12] Canon 3 A(1), quoted in footnote 4, supra, requires a judge to be faithful to the law and maintain professional competence in it. Canon 3 A(7) requires a judge to dispose of all judicial matters promptly, efficiently, and fairly. Canon 3 B(1) requires a judge to discharge his or her administrative responsibilities diligently and competently and to cooperate with others in the administration of court business.
[13] Both LSA R.S. 13:4207 and La. Sup.Ct. Rule, Part G § 2 relate to cases taken under advisement. In pertinent part, LSA R.S. 13:4207 provides that district judges "shall render judgments in all cases taken under advisement by them, within thirty days from the time the cases are submitted for their decision." Similarly, La. Sup.Ct. Rule, Part G § 2 provides, in part, as follows:

(a) A case or other matter shall be considered as fully submitted for decision to the trial judge, and should be decided, immediately upon the conclusion of trial or hearing, and judgment signed expeditiously thereafter.
....
(b) Each judge of a district, juvenile, family, parish, city municipal or traffic court shall report to this court, through the office of Judicial Administrator, on or before the tenth day of each month, all cases which have been fully submitted and under advisement for longer than thirty days, together with an explanation of the reasons for any delay and an expected date of decision. [Emphasis supplied.]
[14] La. Sup.Ct. Rule XIX, § 6(C) provides that "[f]ull-time incumbent judges shall not be subject to the jurisdiction of the lawyer disciplinary agency."
[15] In particular, Canon 7G states that a successful candidate for judicial office is subject to judicial discipline for his or her campaign conduct. See also, Rule 8.2(b) of the Rules of Professional Conduct ("A lawyer who is a candidate for judicial office shall comply with applicable provisions of the Code of Judicial Conduct."). Upon assuming judicial office, Judge Hughes' campaign violations, and her continuing failure to satisfy the unpaid fines, became "judge conduct" properly within jurisdiction of the Commission. Judge Hughes' contention that the Commission could not bring the Lawyer Charges because there had been no judge misconduct is, in this case, factually incorrect.
[16] Because of the number of charges lodged (15), the limited purpose for which they are considered, and the fact that many, if not most, of the charges involve allegations that Attorney Hughes accepted legal fees, failed to do any work on the matters for which she was retained, failed to communicate with her clients, failed to account to them to justify retaining the monies they paid, and failed to refund those portions of the fees that were unearned, we will not discuss each charge in the body of this opinion. Rather, we will limit our discussion here to what we feel to be the most representative examples of misconduct. The charges which are not discussed herein we find to have been proved by clear and convincing evidence. They will be reviewed in an unpublished appendix which will comprise a part of the official record in this case.
[17] Judge Hughes failed to file the required campaign finance disclosure reports timely in multiple elections, including races for a civil court judgeship in 1988, a criminal court judgeship in 1990, a criminal court judgeship in 1992, a criminal court judgeship in 1993, a civil court judgeship in 1994, a city court judgeship in 1994, a criminal court judgeship in 1996, traffic court judgeships on three occasions in 1997 and 1998, and juvenile court judgeships in 1999 and 2000.
[18] By this time, Judge Hughes had assumed the bench. Her office in juvenile court is located in the same building as the civil district court.
[19] Although Judge Hughes testified that she made arrangements for the Spears firm to take over the case, that arrangement was far from firm, and the client was not even informed of it until after she took office.
[20] Judge Hughes reiterated this complaint in a post-argument" Motion to Dismiss, Reopen and/or Remand to the Judiciary Commission for Further Proceedings." Because that motion for the most part reiterates arguments that have been addressed, and rejected, in the body of this opinion, we do not find it necessary to address its allegations at length. Rather, we simply hold that the arguments raised therein are without merit for the reasons expressed in this opinion. The motion is denied.
[21] Judge Hughes blamed her untimely submission on a "flood." However, she failed to explain how a flood that prevented her from getting to the Commission office on October 3, 2002, excused her failure to file the necessary pleadings for another five days.